PEOPLE v BULLOCK

PEOPLE v HASSON

Docket Nos. 89661, 89662. Argued October 10, 1991 (Calendar No. 16).
    Decided June 16, 1992. Rehearing denied in *Hasson, post,* 1203.
    Ruth Bullock and Kenneth Hasson were convicted by separate
    juries in the Clinton Circuit Court, Timothy M. Green, J., of
    possession of 650 grams or more of cocaine, and were sentenced
    to life in prison without possibility of parole. The Court of
    Appeals, SHEPHERD, P.J., and MAHER and SULLIVAN, JJ., in
    separate unpublished opinions per curiam, reversed finding
    that searches of Hasson's luggage and Bullock's vehicle did not
    fall within the automobile exception of the Fourth Amendment
    warrant requirement (Docket Nos. 111276, 111759). Following
    oral argument in the Supreme Court, the parties were ordered
    to reargue to address the effect of *California v Acevedo,* 500 US
    —; 111 S Ct 1982; 114 L Ed 2d 619 (1991), on the search issue,
    and of *Harmelin v Michigan,* 501 US —; 111 S Ct 2680; 115 L
    Ed 2d 836 (1991), on the issue of mandatory life imprisonment.
    The people appeal.
      In an opinion by Chief Justice CAVANAGH, joined by Justices
    LEVIN, BRICKLEY, and GRIFFIN, the Supreme Court *held:*
      The convictions of both defendants are reinstated; however,
    the sentences imposed are struck down as being cruel or
    unusual under Const 1963, art 1; § 16. Thus, with respect to
    these defendants and all other defendants who have been
    sentenced under MCL 333.7403(2)(a)(i), 791.234(4); MSA
    14.15(7403)(2)(a)(i), 28.2304(4) for the same offense, the portion
    of the statute denying parole consideration is struck down, and.
    each defendant, upon completion of ten calendar years of a
    sentence, will become subject to the jurisdiction of the parole

· REFERENCES
Am Jur 2d, Criminal Law §§ 539, 629; Searches and Seizures §§ 16,
    43, 45, 85, 88, 96, 97, 99.
Validity, under federal constitution, of warrantless search of motor
    vehicles—Supreme Court cases. 89 L Ed 2d 939.
Length of sentence as violation of provisions prohibiting cruel and
    unusual punishment. 33 ALR3d 335.

board and eligible for parole consideration in accordance with MCL 791.234(4)(a)-(d), (5); MSA 28.2304(4)(a)-(d), (5).

1. Under the holding of *California v Acevedo,* which expanded the automobile exception to the Fourth Amendment warrant requirement, the police may open and search any container placed or found in an automobile as long as they have the requisite probable cause with regard to the container, even if the probable cause focuses specifically on the container and arises before the container is placed in the automobile. Because in this case there was probable cause to search Hasson's luggage, and because the placement of the luggage in Bullock's automobile brought the case within the automobile exception as defined by *Acevedo,* the failure to obtain a search warrant did not render the search in *Hasson* invalid. Evidence of the cocaine was properly admitted during trial.

2. Under *New York v Belton,* 453 US 454 (1981), incident to a lawful custodial arrest of the occupant of an automobile, the police may search the entire passenger compartment of the automobile, as well as any containers found in the compartment, including the glove compartment and purses. Because Hasson's arrest unquestionably was valid, the search in *Bullock* also was valid, irrespective of the existence of probable cause, a warrant, or exigent circumstances. Traces of cocaine found in Bullock's purse and in the glove compartment were properly admitted into evidence during trial.

3. *Harmelin v Michigan,* which rejected a challenge, under the Eighth Amendment of the United States Constitution, of Michigan's mandatory penalty of life in prison without possibility of parole for possession of 650 grams or more of a mixture containing cocaine, as cruel *and* unusual punishment, while binding and authoritative for purposes of applying the United States Constitution, is only persuasive authority for purposes of interpretation and application by the Michigan Supreme Court of the cruel *or* unusual punishment provision of Michigan's Constitution, Const 1963, art 1, § 16. The Michigan Supreme Court alone is the ultimate authority with regard to the meaning and application of Michigan law, and may interpret the Michigan Constitution more expansively than the United States Constitution. It need not choose to exercise that authority in a given case or area, however. Regardless of whether it is or should be necessary to adduce a "compelling reason" to interpret art 1, § 16 more broadly than the United States Supreme Court interpreted the Eighth Amendment in *Harmelin,* compelling reasons in fact exist to do so.

4. The Michigan Constitution prohibits cruel *or* unusual

punishments, while the Eighth Amendment bars only punishments that are both cruel *and* unusual, a textual difference neither accidental nor inadvertent. In *People v Lorentzen,* 387 Mich 167 (1972), the Supreme Court, specifically noting the textual difference, inferred unusually excessive imprisonment as being included within the cruel or unusual prohibition. A comparison of the historical circumstances surrounding the adoption of the Michigan Constitution in 1963 and those surrounding the adoption of the Eighth Amendment in 1791 leads to the conclusion that the framers of the Michigan Constitution had a purpose in mind different from that attributed to the framers of the Eighth Amendment by the plurality in *Harmelin.* Finally, the Michigan Supreme Court, in interpreting Const 1963, art 1, § 16, has long followed an approach more consistent with the reasoning of the dissenters in *Harmelin,* recognizing in *People v Lorentzen* a prohibition of grossly disproportionate sentences. The analysis of *Lorentzen* foreshadowed the three-pronged test adopted in *Solem v Helm,* 463 US 277 (1983), comparing, first, the gravity of the offense with the harshness of the penalty; second, the sentence imposed with sentences imposed for other crimes within the jurisdiction; and, third, the sentence imposed with sentences imposed for the same crime in other jurisdictions.

5. The penalty in this case is so unduly disproportionate as to be cruel or unusual. It cannot be tailored to a defendant's personal responsibility and moral guilt, it is comparable only to the penalty for first-degree murder, and no other state imposes a penalty even remotely as severe. Thus, with respect to these defendants and all other defendants who have been sentenced under MCL 333.7403(2)(a)(i), 791.234(4); MSA 14.15(7403)(2)(a)(i), 28.2304(4) for the same offense, the portion of the statute denying parole consideration is struck down, and each defendant, upon completion of ten calendar years of a sentence, will become subject to the jurisdiction of the parole board and eligible for parole consideration in accordance with MCL 791.234(4)(a)-(d), (5); MSA 28.2304(4)(a)-(d), (5).

Reversed.

Justice MALLETT, concurring in part and dissenting in part, stated that the constitutional infirmity of MCL 333.7403; MSA 14.15(7403) rests not with its lack of a possibility of parole, but with its mandatory and blanket application to all defendants. While a trial court's inquiry into the constitutionality of the penalty should recognize the Legislature's judgment, the court should afford defendants an opportunity to present substantial, compelling, objective, and verifiable reasons that the penalty as

applied to them is unconstitutionally disproportionate. The possibility that such reasons might convince the trial court to deviate from the penalty and impose a substantial term of years should not be foreclosed. Imposition by the Legislature of a mandatory life sentence without the possibility of parole strips the judiciary of necessary discretion and its responsibility to examine constitutional claims, particularly those regarding cruel or unusual punishment. However, on the basis of the precise circumstances and facts of these cases, it has not been shown that the imposition of the mandatory life sentences without possibility of parole in fact violates Const 1963, art 1, § 16. Nevertheless, because the Supreme Court is not prepared to act as a sentencing court, remand for sentencing hearings should be had to afford both sides·the opportunity to create a record that would establish a foundation to challenge imposition of the penalty.

Justice RILEY, concurring in part and dissenting in part, stated that the mandatory penalty prescribed for possession of 650 grams of cocaine, life imprisonment without the possibility of parole, is not cruel or unusual punishment under Const 1963, art 1, § 16.

The majority has not persuasively established a compelling reason to interpret art 1, § 16 differently from the Eighth Amendment.

The cruel or unusual punishment clause was intended to prohibit inhumane and barbarous treatment of criminals. Previous state constitutions and the case law interpreting them did not recognize a proportional sentencing component with respect to cruel or unusual punishment proscriptions. *People v Lorentzen* was wrongly decided. The application of a proportionality test in *Lorentzen* to art 1, § 16 was not supported by its analysis.

The contention that the Michigan Constitution is an independent source of rights different from its federal counterpart, and that federal case law interpreting the federal constitution is not presumptively correct, is nothing more than an attempt to substitute judicial policy choice for that of the Legislature, as is evidenced by the majority's decision to eschew the historical foundations shared by the Michigan and federal provisions.

The majority has failed to advance compelling reasons for the Michigan Supreme Court to provide a different interpretation of Const 1963, art 1, § 16 than the United States Supreme Court has given the Eighth Amendment in *Harmelin v Michigan*. There is no sound reason to assume that the textual deviation in the Eighth Amendment, "cruel *and* unusual," from

that of the parallel provision of Const 1963, art 1, § 16, "cruel *or* unusual," mandates a different interpretation. Article 1, § 16 is based on the same historical foundation as the Eighth Amendment. By extending the guarantees of the federal constitution to the residents of Michigan, the drafters intended interpretation of Michigan's Constitution to parallel the corresponding federal provision. With regard to whether the penalty at issue meets evolving standards of decency, proportionality, or rehabilitation, the answer must come from the Legislature.

Justice BOYLE, concurring in part and dissenting in part, stated that MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i) is not grossly disproportionate under either the Eighth Amendment or Const 1963, art 1, § 16 but that limited proportionality challenges to the statute as applied are permissible. Because *Lorentzen* fails to give sufficient deference to the judgment of the Legislature, to ensure appropriate deference regarding the gravity of a particular crime and the extent to which varying penological goals inform the scheme of punishment, a court's threshold inquiries should be only whether the sentence is grossly disproportionate. The penalty of mandatory life without parole for possessing 650 grams of cocaine is not grossly disproportionate because the absolute magnitude of the crime is grave and the principle of proportionality does not permit the judiciary to impose on the Legislature its subjective view of appropriate responses to perceived evils. While the sentence is harsh, the social harm caused by the criminal conduct is devastating.

1. CONSTITUTIONAL LAW — SENTENCES — CRUEL OR UNUSUAL PUNISHMENT — MANDATORY LIFE IMPRISONMENT.

The statutory penalty of mandatory life in prison without possibility of parole for possession of 650 grams or more of any mixture containing cocaine is so grossly disproportionate as to be cruel or unusual (Const 1963, art 1, § 16; MCL 333.7403[2][a][i], 791.234[4]; MSA 14.15[7403][2][a][i], 28.2304[4]).

2. SEARCHES AND SEIZURES — WITHOUT WARRANTS — AUTOMOBILES — CONTAINERS.

The police may open and search any container placed or found in an automobile as long as they have the requisite probable cause with regard to the container, even if the probable cause focuses specifically on the container and arises before the container is placed in the automobile (US Const, Am IV).

3. SEARCHES AND SEIZURES — WITHOUT WARRANTS — AUTOMOBILES — PASSENGER COMPARTMENTS.

Incident to a lawful custodial arrest of the occupant of an

automobile, the police may search the entire passenger compartment of the automobile, as well as any containers found in the compartment, including the glove compartment and purses (US Const, Am IV).

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Charles D. Sherman,* Prosecuting Attorney, and *Joel S. Gehrke,* Assisting Prosecuting Attorney, for the people.

*Brisbois & Brisbois* (by *William A. Brisbois*) for defendant Bullock.

*Daniel E. Manville* and *Herb Jordan* for defendant Hasson.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Thomas C. Nelson,* Assistant Attorney General, for the Attorney General; *Richard Thompson,* Oakland County Prosecuting Attorney, and *Michael J. Modelski,* Chief, Appellate Division, for the Oakland County Prosecutor; *William E. Molner,* Assistant Attorney General, for Prosecuting Attorneys Appellate Service; and *Robert Weiss,* President, Prosecuting Attorneys Association, *John D. O'Hair,* Prosecuting Attorney, and *Timothy A. Baughman,* Chief, Research, Training and Appeals, for Prosecuting Attorneys Association.

*John R. Minock* for Criminal Defense Attorneys of Michigan; *Paul J. Denenfeld* for American Civil Liberties Union Fund; *William Swor* for National Association of Criminal Defense Lawyers; *Neal Bush,* President, for National Lawyers Guild; Representative *Perry Bullard,* Chair, for Judiciary Committee, Michigan House of Representatives;

and *Leslie Graves,* President, for Wolverine Bar Association.

*Elizabeth L. Jacobs* addressing *Harmelin v Michigan* and for Leon Brown.

CAVANAGH, C.J. We address in these consolidated cases the validity of a search conducted without a warrant, and the question whether Michigan's mandatory penalty of life in prison without possibility of parole, for possession of 650 grams or more of any mixture containing cocaine, is "cruel or unusual" under our state constitution.

## I. FACTS AND PROCEDURAL HISTORY

On February 24, 1988, defendant Hasson traveled by air from Los Angeles to Lansing's Capital City Airport. He had a return ticket to Los Angeles on a flight scheduled to leave less than four hours after his arrival, yet he had checked two large suitcases. Acting on a tip from airline agents relayed through the Los Angeles police, the Michigan State Police met Hasson's flight. Before Hasson claimed his luggage, a police dog alerted officers to the presence of illegal drugs in both suitcases. The police observed Hasson deplane, retrieve his luggage, make a call from a public phone, and walk outside to the public driveway. After about thirty minutes, Hasson flagged down a car driven and owned by defendant Bullock. Bullock's seventeen-year-old grandson was a passenger in the car. Hasson placed his luggage in the trunk and got in the car, which began to pull away.

At that point, the police stopped the car and arrested all three occupants. The police, without attempting to obtain a warrant, then proceeded to

search the entire car.[1] They examined the glove compartment, Bullock's purse which she left in the car, and the luggage Hasson had placed in the trunk. They found traces of cocaine in the glove compartment and Bullock's purse, and over fifteen kilograms of cocaine in Hasson's luggage.[2] This cocaine was admitted as evidence at trial over Hasson's and Bullock's objections, and both were convicted, in separate jury trials, of knowingly possessing 650 grams or more of cocaine in violation of MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i).[3] As mandated by that statute, in conjunction with MCL 791.234(4); MSA 28.2304(4), both defendants were sentenced to life in prison without any possibility of parole.

The Court of Appeals, in separate unpublished opinions per curiam decided April 24, 1990,[4] reversed both defendants' convictions. The Court held that the cocaine found in Hasson's luggage should have been excluded as the fruit of an invalid search because, while the police had probable cause to believe the luggage contained contraband and therefore were justified in seizing it, the police had no warrant to search it and the case did not fall within the so-called "automobile exception" to the warrant requirement. Because the state lacked sufficient evidence to prosecute without the excluded cocaine, the Court did not re-

[1] The police did telephone the Clinton County Prosecutor's office to ask if a warrant was needed to search the car and the suitcases in the trunk. A prosecutor advised the police that, in his view, a warrant was not required.

[2] The police also found two burnt marijuana cigarettes and assorted drug paraphernalia in the passenger compartment, and several thousand dollars in cash in Bullock's purse.

[3] Bullock's grandson was also charged, but the charges were dismissed before trial on the ground of insufficient evidence linking him to the cocaine.

[4] Docket Nos. 111276 (Bullock) and 111759 (Hasson).

mand for retrial in *Hasson.* The Court, while finding that Bullock lacked standing to challenge the search of Hasson's luggage, held that the traces of cocaine found in Bullock's purse and the glove compartment should also have been excluded as the fruit of an illegal search. Because the Court found that the introduction of that cocaine as evidence was not harmless with regard to Bullock's conviction for possession of the cocaine in Hasson's luggage, the Court reversed the conviction and remanded for retrial in *Bullock.*

We granted leave to appeal, 436 Mich 881 (1990), and subsequently agreed to consider whether the mandatory penalty of life in prison without possibility of parole was invalid under either the federal or state constitutions.[5] Following oral argument during the 1990-91 term, we ordered reargument this term to address the effect of the United States Supreme Court's intervening decisions in *California v Acevedo,* 500 US —; 111 S Ct 1982; 114 L Ed 2d 619 (1991) (dealing with the search issue), and *Harmelin v Michigan,* 501 US —; 111 S Ct 2680; 115 L Ed 2d 836 (1991) (dealing with the penalty issue).

## II. ANALYSIS

### A. THE SEARCH ISSUE: *HASSON*

There is no basis in the Michigan Constitution

---

[5] As Justice BOYLE points out, see *post,* p 72, n 5, Bullock did not raise the penalty issue in the Court of Appeals, and this Court, while agreeing to Hasson's request to add that issue before this Court, denied Bullock's request to add the issue. Our holding on the underlying issue, however, obviously affects Bullock no less than Hasson, as indeed it affects all other persons sentenced under the same penalty and for the same offense as the defendants at bar. See part III. We conclude that it would be incongruous and not conducive to substantial justice to limit our consideration of the penalty issue to Hasson and not Bullock. We, of course, "may, at any time . . . permit the reasons or grounds of appeal to be amended or new grounds to be added," and "enter any judgment or order that ought to have been entered, and enter other and further orders and grant relief as the case may require . . . ." MCR 7.316(A)(3), (7). To the extent necessary, we hereby exercise that authority.

for excluding from evidence the cocaine discovered in this case. Const 1963, art 1, § 11 provides that it "shall not be construed to bar from evidence in any criminal proceeding any narcotic drug . . . seized by a peace officer outside the curtilage of any dwelling house in this state."[6] Our analysis is thus governed exclusively by the United States Constitution, as currently construed by the United States Supreme Court. See *People v Chapman,* 425 Mich 245, 252-253; 387 NW2d 835 (1986).

While the reasoning of the Court of Appeals on this issue constitutes a plausible application of federal constitutional search and seizure law as it existed at the time of that Court's decision, the United States Supreme Court's recent decision in *California v Acevedo, supra,* plainly destroys any claim that Hasson might have had on this issue, and compels reversal of the Court of Appeals. The Court in *Acevedo,* overruling *Arkansas v Sanders,* 442 US 753; 99 S Ct 2586; 61 L Ed 2d 235 (1979), as reaffirmed in *United States v Ross,* 456 US 798, 812-813, 824; 102 S Ct 2157; 72 L Ed 2d 572 (1982), expanded the automobile exception to the Fourth Amendment warrant requirement and held that police may open and search any container placed or found in an automobile, as long as they have the requisite probable cause with regard to such a container, even if such probable cause focuses specifically on the container and arises before the container is placed in the automobile. See *Acevedo,* 114 L Ed 2d 630-634.

---

[6] While cocaine is not technically a "narcotic," we have no doubt that the voters who adopted the 1963 Constitution understood and intended cocaine to be encompassed by the quoted provision. Cocaine has long been grouped with the true narcotic drugs such as heroin for purposes of legal control, and, indeed, was legally defined as a "narcotic" at the time the 1963 Constitution was adopted. See 1948 CL 335.51(13) (Mason's Supp, 1956).

The Court of Appeals rejected Hasson's claim
that probable cause was lacking in this case, and
that holding is not challenged before this Court.
Thus, given that the police had probable cause to
search Hasson's luggage, and because the place-
ment of the luggage in Bullock's car brings this
case within the automobile exception as defined by
*Acevedo,* the failure to obtain a warrant does not
render the search invalid. The cocaine was prop-
erly admitted as evidence at trial.

### B. THE SEARCH ISSUE: *BULLOCK*

Just as in *Hasson,* for reasons noted above, our
analysis here is governed exclusively by the
United States Constitution, as currently construed
by the United States Supreme Court. The Court of
Appeals found the search of Bullock's purse and
the glove compartment of her car invalid, not for
lack of a warrant—which, assuming probable
cause, would clearly have been unnecessary under
the automobile exception even prior to *Acevedo*—
but because it found insufficient probable cause.
The Court of Appeals correctly noted that even a
search of a car without a warrant pursuant to the
automobile exception is strictly limited in scope by
the objects of the search and the places in which
there is probable cause to believe they may be
found, as the United States Supreme Court noted
in *Ross,* 456 US 824, and strongly reaffirmed in
*Acevedo,* 114 L Ed 2d 634. The Court of Appeals
reasoned that the probable cause in this case
extended to Hasson's luggage and no further. The
people contest the Court of Appeals holding that
there was insufficient probable cause to search the
passenger compartment of Bullock's car, given the
probable cause relating to Hasson's luggage and
the circumstances under which Hasson arrived at

the airport and was picked up by Bullock, apparently in response to Hasson's phone call.

Probable cause is by its very nature an issue closely tied to the specific facts of each case, and the question in this case is arguably a close one. We need not decide that question, however. Under *New York v Belton,* 453 US 454; 101 S Ct 2860; 69 L Ed 2d 768 (1981), the police may, as a contemporaneous incident of a lawful custodial arrest of the occupant of an automobile, search the entire passenger compartment of the automobile and any containers found therein, including glove compartments and purses. Because Hasson's arrest, at least, was unquestionably valid, there can be no doubt that this search was also valid, irrespective of the existence of probable cause, a warrant, or exigent circumstances. See *Chapman,* 425 Mich 250-252. The traces of cocaine found in Bullock's purse and in the glove compartment were thus properly admitted as evidence at trial.[7]

---

[7] Bullock raised three additional challenges to her conviction in the Court of Appeals that that Court did not explicitly address: (1) that the admission into evidence of the traces of cocaine found in the glove compartment and Bullock's purse was erroneous because it constituted "other acts" evidence not admissible under MRE 404(b); (2) that the denial of Bullock's request to waive jury trial because of lack of prosecutorial consent, in accordance with MCL 763.3; MSA 28.856 (as amended by 1988 PA 89, § 1, effective June 1, 1988, shortly before Bullock's trial took place), was inconsistent with then-MCR 6.101(F)(1)(c)(ii), thereby unconstitutionally transgressing this Court's authority to promulgate rules of court procedure under Const 1963, art 6, § 5; and (3) that the evidence was insufficient to support Bullock's conviction.

Whatever merit the first contention may have, we note that Bullock failed to raise any timely objection at trial on the basis of MRE 404(b), and we therefore reject this contention on that basis. The second contention, whatever merit it may have had at the time, is now moot in light of MCR 6.401 (effective October 1, 1989), which provides, consistently with MCL 763.3; MSA 28.856, that a defendant's waiver of jury trial is contingent on "the consent of the prosecutor." See also MCR 6.302(B)(3)(b) (effective October 1, 1989). Any retrial of Bullock would obviously be governed by the current court rules, and we therefore reject her second contention on that basis. (We note that Bullock has not challenged the denial of her

C. THE PENALTY ISSUE: *BULLOCK* AND *HASSON*

1. THE APPLICABILITY OF CONST 1963, ART 1, § 16

The United States Supreme Court, in *Harmelin v Michigan, supra,* rejected a challenge, brought under the "cruel and unusual punishments" clause of the Eighth Amendment of the United States Constitution, to Michigan's mandatory penalty of life in prison without possibility of parole for possession of 650 grams or more of a mixture containing cocaine. We address here a challenge to that penalty on the basis of Const 1963, art 1, § 16, which is worded differently from,[8] and was ratified more than 171 years after, the Eighth Amendment.

While *Harmelin* is binding and authoritative for purposes of applying the United States Constitution, it is only persuasive authority for purposes of this Court's interpretation and application of the Michigan Constitution. This Court alone is the ultimate authority with regard to the meaning and application of Michigan law. See *In re Apportionment of State Legislature—1982,* 413 Mich 96, 116, n 11; 321 NW2d 565 (1982), app dis for want of substantial federal question sub nom *Kleiner v Sanderson,* 459 US 900 (1982). In the case of a divided United States Supreme Court decision, we

request to waive jury trial on the ground that such denial violates any constitutional right to waive jury trial, and we therefore express no view on that issue in this case.) The Court of Appeals implicitly rejected Bullock's third contention by remanding the case for retrial, which is barred on double jeopardy grounds when a conviction is reversed because of insufficient evidence. See *Burks v United States,* 437 US 1; 98 S Ct 2141; 57 L Ed 2d 1 (1978). Upon review of the record, we find this contention devoid of merit and reject it also.

[8] US Const, Am VIII provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel *and* unusual punishments inflicted." (Emphasis added.) Const 1963, art 1, § 16 provides: "Excessive bail shall not be required; excessive fines shall not be imposed; cruel *or* unusual punishment shall not be inflicted; nor shall witnesses be unreasonably detained." (Emphasis added.)

may in some cases find more persuasive, and
choose to rely upon, the reasoning of the dissent-
ing justices of that Court, and not the majority, for
purposes of interpreting our own Michigan Consti-
tution. See n 9.

To note that we have the authority to interpret
the Michigan Constitution more expansively than
the United States Constitution does not, of course,
lead to the conclusion that we should or will
choose to exercise that authority in any particular
area.[9] It is entirely possible, in a given case or

[9] We have, however, afforded greater protection under the Michigan
Constitution, or Michigan case law, in many areas. Compare, e.g.,
*People v Beach,* 429 Mich 450, 464-465; 418 NW2d 861 (1988) (lesser
included offense instructions), with *Keeble v United States,* 412 US
205; 93 S Ct 1993; 36 L Ed 2d 844 (1973); *Delta Charter Twp v
Dinolfo,* 419 Mich 253, 265-278; 351 NW2d 831 (1984) (right of un-
related persons to share a house in an area zoned for "single-family
residences"), with *Village of Belle Terre v Boraas,* 416 US 1; 94 S Ct
1536; 39 L Ed 2d 797 (1974); *People v Cooper,* 398 Mich 450, 460-461;
247 NW2d 866 (1976) (double jeopardy in the context of successive
prosecutions by different sovereigns), with *Bartkus v Illinois,* 359 US
121; 79 S Ct 676; 3 L Ed 2d 684 (1959); *People v Burden,* 395 Mich
462; 236 NW2d 505 (1975) (unanimous jury verdicts in criminal cases),
with *Apodaca v Oregon,* 406 US 404; 92 S Ct 1628; 32 L Ed 2d 184
(1972); *People v Jackson,* 391 Mich 323, 337-339; 217 NW2d 22 (1974)
(right to counsel at photographic displays), with *United States v Ash,*
413 US 300; 93 S Ct 2568; 37 L Ed 2d 619 (1973); *People v White,* 390
Mich 245, 255-258; 212 NW2d 222 (1973) (adopting the "same transac-
tion" test for double jeopardy in the context of successive prosecu-
tions), with *Grady v Corbin,* 495 US 508; 110 S Ct 2084; 109 L Ed 2d
548 (1990); *People v Turner,* 390 Mich 7, 22; 210 NW2d 336 (1973)
(adopting an objective test for criminal entrapment), with *United
States v Russell,* 411 US 423; 93 S Ct 1637; 36 L Ed 2d 366 (1973);
*Shakespeare Co v Lippman's Tool Shop Sporting Goods Co,* 334 Mich
109, 112-113; 54 NW2d 268 (1952) (the right to sell goods at prices
below the minimum set by "fair trade agreement"), with *Old Dear-
born Distributing Co v Seagram-Distillers Corp,* 299 US 183; 57 S Ct
139; 81 L Ed 109 (1936); and *People v Victor,* 287 Mich 506, 514-518;
283 NW 666 (1939) (the right to sell trading stamps), with *Rast v Van
Deman & Lewis Co,* 240 US 342; 36 S Ct 370; 60 L Ed 679 (1916).

Moreover, this Court has, on occasion, led rather than followed the
United States Supreme Court. For example, just one year after the
ratification of the federal Fourteenth Amendment in 1868, and
eighty-five years before the United States Supreme Court outlawed
racial segregation in public schools on the basis of that amendment,
this Court, in an opinion by Chief Justice COOLEY, held that black

area, that our independent judgment will lead to our agreeing with the reasoning of the United States Supreme Court. See, e.g., *Doe v Dep't of Social Services,* 439 Mich 650; 487 NW2d 166 (1992) (rejecting a state constitutional right to abortion funding). For example, in the area of search and seizure law, governed by the Fourth Amendment of the United States Constitution and Const 1963, art 1, § 11, this Court has held, on the basis of a careful examination of the text and history of the latter clause, and the understanding of the voters who adopted it, that it should not be interpreted to afford any greater protection than the parallel federal clause, absent a "compelling reason" for doing so. See *People v Collins,* 438 Mich 8, 25-29; 475 NW2d 684 (1991); *People v Perlos,* 436 Mich 305, 313, n 7; 462 NW2d 310 (1990); *People v Nash,* 418 Mich 196, 208-215; 341 NW2d 439 (1983) (opinion of BRICKLEY, J.). See also *People v Hill,* 429 Mich 382, 393; 415 NW2d 193 (1987); *People v Collier,* 426 Mich 23, 39; 393 NW2d 346 (1986) (interpreting the Self-Incrimination Clause of Const 1963, art 1, § 17).

The application of the "compelling reason" standard remains an issue on which jurists of reason may differ, as they have differed in the past.[10] We

children had the right, under Michigan law, to attend the public schools on a free, nonsegregated basis. Compare *People ex rel Workman v Detroit Bd of Ed,* 18 Mich 400, 408-410 (1869), with *Brown v Topeka Bd of Ed,* 347 US 483; 74 S Ct 686; 98 L Ed 873 (1954).

[10] Compare, e.g., *Collins,* 438 Mich 25-29 (opinion of the Court), with 438 Mich 40-54 (CAVANAGH, C.J., joined by LEVIN, J., dissenting). We note, without expressing any view on the issue, that a number of courts and scholars, including Justice Robert F. Utter of the Washington Supreme Court and former Justice Hans A. Linde of the Oregon Supreme Court, have proposed approaches to state constitutional interpretation that, if valid, would suggest that universal and automatic application of a "compelling reason" standard for differential state constitutional interpretation would conflict with sound principles of judicial federalism. See, e.g., Linde, *First things first: Rediscovering the states' bills of rights,* 9 U Balt L R 379 (1980); Utter

have no need, however, to further explore this
broad issue in these cases. We find that regardless
of whether it is or should be necessary to adduce a
"compelling reason" to interpret Const 1963, art 1,
§ 16 more broadly than the United States Supreme
Court interprets the Eighth Amendment, at least
three compelling reasons do, in fact, exist to inter-
pret our state constitutional provision more
broadly in these cases than the United States
Supreme Court interpreted the Eighth Amend-
ment in *Harmelin.* We set forth these reasons in
parts II(C)(2), (3), and (4). Furthermore, we find that a
proper interpretation of Const 1963, art 1, § 16, in
accordance with this Court's longstanding prece-
dent in this area, requires us to strike down the
penalty at issue as unjustifiably disproportionate
to the crime for which it is imposed, and therefore
"cruel or unusual." See part II(C)(5).

## 2. TEXTUAL DIFFERENCES

First, as we have already noted, the Michigan
provision prohibits "cruel *or* unusual" punish-
ments, while the Eighth Amendment bars only
punishments that are both "cruel *and* unusual."
This textual difference does not appear to be acci-
dental or inadvertent.[11] Language providing that

& Pitler, *Presenting a state constitutional argument: Comment on
theory and technique,* 20 Ind L R 635 (1987); see also, e.g., *State v
Kennedy,* 295 Or 260, 262-272; 666 P2d 1316 (1983) (Linde, J.); *State v
Ball,* 124 NH 226, 231-233; 471 A2d 347 (1983); *State v Coe,* 101 Wash
2d 364, 373-374; 679 P2d 353 (1984) (Utter, J.); *State v Hempele,* 120
NJ 182, 195-198; 576 A2d 793 (1990); *Commonwealth v Edmunds,* 526
Pa 374, 388-391; 586 A2d 887 (1991).

[11] While the historical record is not sufficiently complete to inform
us of the precise rationale behind the original adoption of the present
language by the Constitutional Convention of 1850, it seems self-
evident that any adjectival phrase in the form "A *or* B" necessarily
encompasses a broader sweep than a phrase in the form "A *and* B."
The set of punishments which are *either* "cruel" *or* "unusual" would
seem necessarily broader than the set of punishments which are *both*
"cruel" *and* "unusual."

"no cruel or unusual punishments shall be inflicted" was included in Article II of the Northwest Ordinance of 1787. Michigan's first Constitution, adopted in 1835, provided that "cruel *and unjust* punishments shall not be inflicted." Const 1835, art 1, § 18 (emphasis added). The Constitution of 1850 provided that "cruel *or* unusual punishment shall not be inflicted . . . ." Const 1850, art 6, § 31 (emphasis added). Identical language was adopted as part of the 1908 and 1963 Constitutions. See Const 1908, art 2, § 15; Const 1963, art 1, § 16.

This Court, in *People v Lorentzen,* 387 Mich 167, 171-172; 194 NW2d 827 (1972),[12] took specific note of this difference in phraseology and suggested that it might well lead to different results with regard to allegedly disproportionate prison terms. "The prohibition of punishment that is unusual but not necessarily cruel carries an implication that unusually excessive imprisonment is included in that prohibition." *Id.* at 172.[13] As this Court noted in *Collins,* a "significant textual difference[ ] between parallel provisions of the state and federal constitutions" may constitute a "compelling reason" for a different and broader interpretation of the state provision. 438 Mich 32.

---

[12] The decision in *Lorentzen* was unanimous with regard to the issues relevant to these cases. While Justices T. G. Kavanagh and Williams filed separate opinions concurring in part and dissenting in part, they dissented only insofar as the majority refused to strike down the disputed marijuana statute itself and reverse the defendant's conviction outright. They expressed complete agreement with the majority's reasoning and conclusion with regard to proportionality analysis and the unconstitutionality of the sentence at issue. See 387 Mich 182-183.

[13] The *Harmelin* majority, conversely, conceded that "[s]evere, mandatory penalties may be cruel," but maintained that "they are not unusual in the constitutional sense . . . ." 115 L Ed 2d 864 (opinion of Scalia, J., in the portion constituting the opinion of the Court). This poses a somewhat curious contradiction, in that *Harmelin* suggested this kind of penalty might be cruel but not unusual, while *Lorentzen* suggested it might be unusual but not cruel. We follow *Lorentzen,* however, as Michigan precedent regarding Const 1963, art 1, § 16.

### 3. HISTORICAL FACTORS

Second, while two members of the *Harmelin* majority maintained that the historical circumstances and background of the adoption of the Eighth Amendment preclude the notion that the federal clause contains a "proportionality principle," see 115 L Ed 2d 846-858 (opinion of Scalia, J., joined by Rehnquist, C.J.), such a conclusion cannot be reached with regard to the framing and adoption of the Michigan Constitution of 1963. Whatever the legal terms "cruel" and "unusual" were understood to mean in 1791 when the Eighth Amendment was ratified—or in 1689 when its antecedent, the English Bill of Rights, was adopted —by 1963 those words had been interpreted and understood by the United States Supreme Court *and by this Court* for more than half a century to include a prohibition on grossly disproportionate sentences. See *Weems v United States,* 217 US 349, 366-367, 371; 30 S Ct 544; 54 L Ed 793 (1910); *Harmelin,* 115 L Ed 2d 876 (White, J., dissenting); *People v Mire,* 173 Mich 357, 361-362; 138 NW 1066 (1912).[14]

This would constitute another "compelling reason" under *Collins* for a broader view of state constitutional protection, in that "history provide[s] reason to believe that those who framed and adopted the state provision had a different purpose in mind," 438 Mich 32—different, at any

---

[14] We discuss more thoroughly in part II(C)(4) this Court's historical jurisprudence supporting the proportionality component of our state "cruel or unusual punishment" clause, as first unequivocally articulated in *People v Mire, supra,* just two years after *Weems,* and reaffirmed in *People v Lorentzen, supra.*

rate, from the historical understanding asserted by Justice Scalia.[15]

#### 4. LONGSTANDING MICHIGAN PRECEDENT

Finally, this Court, in interpreting Const 1963, art 1, § 16, has long followed an approach more consistent with the reasoning of the *Harmelin* dissenters than with that of the *Harmelin* majority. Twenty years ago, in *People v Lorentzen, supra,* we struck down, under both the Eighth Amendment and Const 1963, art 1, § 16, a mandatory minimum sentence of twenty years in prison (reducible to approximately ten years by earning "good time") for selling any amount of marijuana. See 387 Mich 181.

Our analysis in *Lorentzen* foreshadowed in a striking manner the three-pronged test later adopted by the United States Supreme Court in *Solem v Helm,* 463 US 277, 290-291; 103 S Ct 3001; 77 L Ed 2d 637 (1983). Thus, *Lorentzen* noted the severity of the sentence imposed and the fact that it would apply to a marijuana sale by "a first offender high school student." 387 Mich 176; accord *Solem,* 463 US 290-291 ("[f]irst, we look to the gravity of the offense and the harshness of the penalty"). *Lorentzen* then compared the penalty to those imposed for numerous other crimes in Michigan. 387 Mich 176-177; accord *Solem,* 463 US 291 ("[s]econd, it may be helpful to compare the sentences imposed on other criminals in the same jurisdiction"). *Lorentzen* further compared Michi-

[15] We do not suggest any endorsement of Justice Scalia's view of the historical understanding regarding the Eighth Amendment. Justice White noted that some scholars have reached conclusions sharply at odds with Justice Scalia's views. See *Harmelin,* 115 L Ed 2d 876, n 1 (White, J., dissenting), quoting Granucci, *"Nor cruel and unusual punishments inflicted": The original meaning,* 57 Cal L R 839, 860 (1969).

gan's penalty for selling marijuana to the penalties imposed for that offense by other states. 387 Mich 179; accord *Solem,* 463 US 291-292 ("[t]hird, courts may find it useful to compare the sentences imposed for commission of the same crime in other jurisdictions"). Finally, *Lorentzen* applied a fourth criterion rooted in Michigan's legal traditions, and reflected in the provision for "indeterminate sentences" of Const 1963, art 4, § 45: the goal of rehabilitation. See 387 Mich 179-181.

It is unclear, in the wake of *Harmelin,* whether *Lorentzen's* or *Solem's* analysis survives as a matter of federal constitutional law,[16] and that need not concern us in any event. *Lorentzen's* analysis, although relying in the alternative on the Eighth Amendment, was firmly and sufficiently rooted in Const 1963, art 1, § 16. Indeed, we preceded our proportionality[17] analysis in *Lorentzen* with a

[16] See *Harmelin,* 115 L Ed 2d 858 (opinion of Scalia, J.) (advocating overruling *Solem* outright); *id.,* 115 L Ed 2d 871-872 (Kennedy, J., concurring) (purporting to reaffirm *Solem,* while applying only the first prong of its analysis); *id.,* 115 L Ed 2d 880 (White, J., dissenting) (asserting that Justice Kennedy's analysis would "eviscerate [*Solem*], leaving only an empty shell").

[17] Because the similarity in terminology may create confusion, we note that the *constitutional* concept of "proportionality" under Const 1963, art 1, § 16 is distinct from the nonconstitutional "principle of proportionality" discussed in *People v Milbourn,* 435 Mich 630, 650; 461 NW2d 1 (1990), although the concepts share common roots. The duty of the appellate courts to review trial court sentences within the applicable statutory ranges for abuse of discretion, as reaffirmed in *Milbourn,* is rooted not in Const 1963, art 1, § 16, but rather reflects the Legislature's intent "in setting a range of allowable punishments for a single felony . . . ." 435 Mich 651. *Milbourn* obviously has no applicability to a legislatively mandated sentence because the trial court, in that case, lacks any discretion to abuse. *Milbourn* involved the relationship between the trial and appellate courts as they work together to fulfill the Legislature's intent, under the belief "that judicial sentencing discretion should be exercised, within the legislatively prescribed range, according to the same principle of proportionality that guides the Legislature in its allocation of punishment over the full spectrum of criminal behavior." *Id.* By contrast, the issue under Const 1963, art 1, § 16, as raised in these cases and others, concerns whether the punishment concededly chosen or authorized by

lengthy review of Michigan case law dating back
to 1879. See 387 Mich 173-176. We believe the
precedential weight of *Lorentzen* and its anteced-
ents, as a matter of Michigan law, constitutes a
very compelling reason not to reflexively follow
the latest turn in the United States Supreme
Court's Eighth Amendment analysis. We therefore
continue to adhere, on the basis of the Michigan
Constitution, to the analysis set forth in *Lorentzen*
and later adopted in *Solem*.[18]

the Legislature is so grossly disproportionate as to be unconstitution-
ally "cruel or unusual."

[18] Justice RILEY would discard this Court's unanimous decision in
*Lorentzen* as "wrongly decided." *Post,* p 46. It is true, of course, as
*Lorentzen* itself conceded, that some of the early "cruel or unusual
punishment" case law of this Court is equivocal and open to conflict-
ing interpretation, but we must take issue with our colleague's
description of much of that case law.

For example, while our colleague cites language from *People v
Morris,* 80 Mich 634; 45 NW 591 (1890), concededly supportive of her
argument, see *post,* p 51, *Morris* also contains language that, in the
alternative, applied proportionality analysis:

But for the disposition of this case we may adopt the rule
contended for, and then we must find (in order to declare the
law unconstitutional) that the minimum punishment provided
by the law is so *disproportionate to the offense* as to shook [sic]
the moral sense of the people. [*Id.* at 639. Emphasis added.]

Contrary to our colleague's assertion, this Court's decision in *Robi-
son v Miner,* 68 Mich 549; 37 NW 21 (1888), did not involve only the
"excessive fines" clause of Const 1850, art 6, § 31. Cf. RILEY, J., *post,* p
49, n 6. In fact, the liquor law at issue authorized not only the
imposition of fines but also imprisonment and, in the case of a second
offense, suspension of the privilege of selling liquor for five years.
Obviously, the latter penalty could not be regarded as a mere mone-
tary "fine"; in describing the relevant issue, *Robison* quoted Const
1850, art 6, § 31 in its entirety, including the prohibition on "cruel or
unusual punishment." 68 Mich 559-560. Indeed, the *fines* imposed by
the liquor law, like the imprisonment penalties, were *upheld* in
*Robison,* and were not even regarded as central to the dispute. See *id.*
at 560, 564; accord *Luton v Newaygo Circuit Judge,* 69 Mich 610, 613;
37 NW 701 (1888).

In striking down the five-year suspension penalty under Const 1850,
art 6, § 31, *Robison* expressly emphasized the fact that such a penalty
has a different and far more severe character than a mere monetary
fine. See 68 Mich 562-563.

These *punishments* have always been regarded as incompatible with our institutions, and there can be no doubt that *the cruel and unusual punishments* forbidden by the United States Constitution had special reference to the barbarities of the old law of felony. *It is equally clear* that any fine *or penalty* is *excessive* which seriously impairs the capacity of gaining a business livelihood. The *penalties* in this act, which are imperative and not discretionary, must necessarily break up business, and *are not measured by any standard of proportion* or amount. [*Id.* at 563. Emphasis added.]

It is thus clear that *Robison* strongly foreshadowed the development of the proportionality component of our "cruel or unusual punishment" jurisprudence, as this Court recognized in *Lorentzen,* 387 Mich 174. The only language from *Robison* quoted by our colleague is from the separate opinion of Chief Justice SHERWOOD, who *dissented* from the *Robison* Court's decision to strike down the five-year suspension penalty as "cruel or unusual." See 68 Mich 573; RILEY, J., *post,* p 49, n 6. Even Chief Justice SHERWOOD, however, suggested agreement with the principle of proportionality, by stating that the issue was whether the Legislature's "enactments are so far in excess of what is necessary to furnish the protection desired as to be obnoxious to the Constitution, which forbids 'cruel and unusual punishments' . . . ." 68 Mich 574.

Our colleague suggests that *People v Murray,* 72 Mich 10; 40 NW 29 (1888), involved only nonconstitutional sentence review analogous to that applied in *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990). RILEY, J., *post,* p 49, n 6. While it is true that *Murray* involved a judicially imposed discretionary sentence, rather than a sentence mandated by the Legislature, this Court stated that "the *Constitution* has not left the liberty of the citizen of any state entirely to the indiscretion or caprice of its judiciary, but enjoins upon all that *unusual punishments* shall not be inflicted." 72 Mich 17 (emphasis added). *Murray* thus clearly foreshadowed modern *constitutional* proportionality analysis. The fact that *Murray* also stated that "the present case shows an abuse of the discretion vested by the statute in the circuit judge," *id.,* thereby also foreshadowing *Milbourn* analysis to some extent, does not change the constitutional aspect of the case. See n 17 (explaining the distinction between *Milbourn* proportionality analysis and constitutional proportionality analysis).

Our colleague states that *People v Armstrong,* 73 Mich 288; 41 NW 275 (1889), "never addressed the issue" whether the challenged municipal handbill ordinance was unconstitutionally harsh, "because it found that the municipality did not have the authority to enact the ordinance in question." RILEY, J., *post,* p 50, n 6. *Armstrong,* however, stated:

The unreasonableness of this ordinance is made apparent when we consider the penalty which may be imposed for its violation,—a fine of $100, and costs of prosecution, and, in default of payment, imprisonment in the county jail or Detroit House of Correction for a period of six months. [73 Mich 295.]

## 5. APPLICATION

Applying the *Lorentzen-Solem* analysis to these cases, we conclude, largely for the reasons stated by Justice White in his dissenting opinion in *Harmelin,* that the penalty at issue here is so grossly disproportionate as to be "cruel or unusual." The penalty is imposed for mere possession of cocaine, without any proof of intent to sell or distribute.[19] The penalty would apply to a teenage

The Court concluded: "This ordinance *not only* does not come within the power granted by the charter, *but it is also unreasonable and unwarranted." Id.* at 296 (emphasis added).

Our colleague makes short shrift of *People v Mire, supra,* which, as even she concedes, strongly supports *Lorentzen's* proportionality approach. See RILEY, J., *post,* p 52; *Mire,* 173 Mich 361-362, quoted in *Lorentzen,* 387 Mich 175-176. *Mire* has never been overruled or questioned by this Court. We disagree with our colleague's contention that *Mire* was "abandoned" in *Smith v Wayne Probate Judge,* 231 Mich 409; 204 NW 140 (1925). See RILEY, J., *post,* p 52. *Smith* did not cite *Mire* and did not address the proportionality issue. Chief Justice McDONALD's plurality opinion merely found that the involuntary sterilization of "feeble-minded persons" did not involve any "element of punishment," being supposedly "analogous to compulsory vaccination," and that the "cruel or unusual punishment" clause was therefore not even implicated. 231 Mich 416. We agree fully with the unremarkable dicta in *Smith* (quoted with emphasis by our colleague, RILEY, J., *post,* pp 52-53) to the effect that the purpose of the clause "is to place a limitation on the power of the legislature in fixing punishment for crimes," and that "[i]t has reference only to punishments inflicted after convictions of crimes." 231 Mich 416. This dicta obviously sheds no light on what the scope of that "limitation" is.

*Lorentzen* cited still other cases which arguably or implicitly support some form of proportionality analysis. 387 Mich 176. Thus, we can only beg to differ with our colleague's assertion that "proportionality is not, and has never been, a component of the 'cruel or unusual punishment' clause of this state's constitution," RILEY, J., *post,* p 46, and especially her assertion that "an opposite conclusion cannot be seriously maintained," RILEY, J., *post,* p 62. To the extent that language in some of the early case law may be equivocal or in conflict, *Lorentzen* long ago answered the question which tendency this Court, in modern times, has found most persuasive.

[19] To be sure, it may be argued that possession of such a large quantity of drugs is a fact from which, depending on the context, a jury might properly infer an intent to sell or distribute. We agree, and it is entirely possible that the evidence in this case *would have been* sufficient to support convicting both defendants of possession with intent to sell or deliver. But no jury drew, or was asked to draw,

first offender who acted merely as a courier.[20] Indeed, on the basis of the information before this Court, it appears that prior to the offense giving rise to this case, defendant Bullock, a forty-eight-year-old grandmother, had never been convicted of any serious crime[21] and had held a steady job as an autoworker for sixteen years.[22]

such an inference with regard to these defendants. By choosing to prosecute these defendants solely for possession, the people avoided the need to meet the heavy burden of proof beyond a reasonable doubt that these defendants intended to sell or distribute. Therefore, they must be deemed innocent of any such intent for purposes of analyzing the facial proportionality of the disputed penalty to the offense for which it is imposed. It would be inconsistent with the most basic norms of our system of justice to treat these defendants, for present purposes, as guilty of a crime of which they were never convicted, and for which the people never even sought to prosecute them.

[20] Indeed, we may take judicial notice that the penalty has already been applied to several teenage first offenders.

[21] According to her presentence investigation report, Bullock was convicted of three misdemeanors in 1960, when she was twenty years old: drunkenness ($5 fine), operating a vehicle with a suspended license (fine and costs of $18), and gambling (fine and costs of $15 and fifteen days in jail). It would be unrealistic to view such youthful indiscretions almost thirty years prior to the instant offense as indicative of any deep-seated criminal or recidivist tendencies.

[22] We are not unmindful of the fact that the two defendants before us present markedly different backgrounds, and that Hasson's background appears to be far less sympathetic than Bullock's. Cf. BOYLE, J., *post,* p 72, n 5. The penalty at issue, however, was imposed on both defendants without regard for either's particular record or individual circumstances. Because of the mandatory character of the penalty, no sentencing hearings were ever held. While the record before us contains presentence investigation reports prepared with regard to each defendant, neither the people nor the defendants had any incentive to challenge the accuracy, weight, or significance of the information contained therein. Thus, we could not, at this particular stage of the litigation, properly analyze the constitutionality of the penalty as applied to these particular defendants. We must simply determine whether the penalty is facially unconstitutional in light of the specific crime for which it is imposed. Because we conclude that it is, we need not express any view regarding how defendant Hasson's alternative as-applied challenge to the penalty would properly have been dealt with, or whether a remand for sentencing hearings would have been necessary with regard to both Bullock and Hasson, in order to properly address any as-applied challenge. Cf. BOYLE, J., *post,* p 72, n 5; MALLETT, J., *post,* p 45.

We note that a defendant's prior record and individual circum-

It is true, as Justice Kennedy noted in *Harmelin,* that the collateral effects flowing even from mere possession of cocaine are terrible indeed. See 115 L Ed 2d 870-871. But conviction of the crime involved here does not require any proof that the defendant committed, aided, intended, or even contemplated any loss of life or other violent crime, or even any crime against property. As Justice White correctly noted in *Harmelin,* "[t]o be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." *Id.,* 115 L Ed 2d 883. While we emphatically do not minimize the gravity and reprehensibility of defendants' crime, it would be profoundly unfair to impute full personal responsibility and moral guilt to defendants for any and all collateral acts, unintended by them, which might have been later committed by others in connection with the seized cocaine. Persons who independently commit violent and other crimes in connection with illegal drugs can and should be held individually responsible by our criminal justice system.

Thus, even under Justice Kennedy's restrictive view of *Solem,* it is clear that an application of *Solem's* first prong "leads to an inference of gross disproportionality." *Harmelin,* 115 L Ed 2d 871 (Kennedy, J., concurring). Application of the second and third prongs of the *Lorentzen-Solem* analysis strongly reinforces that inference.[23] As Justice White noted in *Harmelin,* aside from man-

_____

stances are, of course, properly subject to consideration by the parole board, within the limits provided by law, in reaching any determination with regard to granting parole. See part III; MCL 791.233(1)(a), 791.235; MSA 28.2303(1)(a), 28.2305.

[23] Because the penalty at issue here so clearly fails under the three primary prongs of the *Lorentzen-Solem* analysis, we need not address at any length the fourth *Lorentzen* factor relating to the goal of rehabilitation. We believe, however, that application of that factor would clearly support our conclusion that this penalty is "cruel or

ufacture, delivery, possession with intent to deliver, and possession of 650 grams or more of a substance containing cocaine or illegal narcotics, only first-degree murder—that is, "wilful, deliberate, and premeditated" murder, or murder committed in the course of certain serious felonies—is punishable in Michigan by mandatory life imprisonment without possibility of parole. See 115 L Ed 2d 885; MCL 750.316; MSA 28.548. The defendants in this case have been punished more severely than they could have been for second-degree murder, rape, mutilation, armed robbery, or other exceptionally grave and violent crimes.

Furthermore, as Justice White also noted, no other state in the nation imposes a penalty even remotely as severe as Michigan's for mere possession of 650 grams or more of cocaine. See 115 L Ed 2d 885-886. "Of the remaining 49 States, only Alabama provides for a mandatory sentence of life imprisonment without possibility of parole for a first-time drug offender, and then only when a defendant possesses ten kilograms or more of cocaine." *Id.,* 115 L Ed 2d 886.

In sum, the only fair conclusion that can be reached regarding the penalty at issue is that it constitutes an unduly disproportionate response to the serious problems posed by drugs in our society. However understandable such a response may be, it is not consistent with our constitutional prohibition of "cruel or unusual punishment." The penalty is therefore unconstitutional on its face.

The proportionality principle inherent in Const 1963, art 1, § 16, is not a simple, "bright-line" test,

unusual." As Justice BOYLE suggested in *People v Schultz,* 435 Mich 517, 533-534; 460 NW2d 505 (1990), even the compelling interests underlying the "public policy that decries the scourge of drugs" should not be permitted to overwhelm "the equally important belief that only the rarest individual is wholly bereft of the capacity for redemption."

and the application of that test may, concededly, be analytically difficult and politically unpopular, especially where application of that principle requires us to override a democratically expressed judgment of the Legislature. The fact is, however, the people of Michigan, speaking through their constitution, have forbidden the imposition of cruel or unusual punishments, and we are duty-bound to devise a principled test by which to enforce that prohibition, and to apply that test to the cases that are brought before us. The very purpose of a constitution is to subject the passing judgments of temporary legislative or political majorities to the deeper, more profound judgment of the people reflected in the constitution, the enforcement of which is entrusted to our judgment.[24]

### III. CONCLUSION

For the reasons stated in parts II(A) and (B), we reverse the judgments of the Court of Appeals and reinstate the convictions of both defendants at bar. For the reasons stated in part II(C), however, we strike down the sentences imposed on both defen-

[24] Thus, while we agree with Justice RILEY's admonition that "it is not within the power of this Court to correct the perceived injustice by judicially legislating a socially or politically desirable result," *post,* p 56, we disagree with her assertion that our decision today conflicts with that principle. Furthermore, we note that our colleague herself offers no method by which to determine what kinds of punishments are forbidden under Const 1963, art 1, § 16, other than the vague and unworkable test of whether a punishment is "inhumane and barbarous," *post,* p 47, or perhaps whether it is analogous to "the abuses imposed by the Stuarts, during the reign of King James II," *post,* p 54. Because our colleague evidently does not find mandatory life imprisonment without possibility of parole to be "inhumane and barbarous," and because she rejects any principle of proportionality, it would seem to follow under her analysis that this Court would be compelled to uphold such a penalty even if imposed on a child for stealing a loaf of bread, or on a forgetful taxpayer who fails to file a return on time.

dants as "cruel or unusual" under Const 1963, art 1, § 16.

The remaining question is what remedy to afford. In considering this question, we are guided by several factors. First, there are three aspects to the severity of the penalty at issue: (1) its length (life); (2) its mandatory character, i.e., the absence of individualized consideration for each defendant at the sentencing stage; and (3) the absence of any possibility of individualized parole consideration for each defendant. Second, our holding today is necessarily limited to the precise issue before us; we do not address today the validity of a hypothetical penalty lacking any of these three attributes. Third, the defendants at bar, in challenging this penalty, focused especially on the absence of the possibility of parole.[25] Finally, our decision today necessarily invalidates the sentences of all defendants currently incarcerated under the same penalty, and for committing the same offense, as the defendants at bar.

We conclude that the most appropriate remedy under the circumstances is to ameliorate the no-parole feature of the penalty. We therefore strike down, with regard to these defendants and all others who have been sentenced under the same penalty and for the same offense, that portion of MCL 791.234(4); MSA 28.2304(4) denying such defendants the parole consideration otherwise available upon completion of ten calendar years of the sentence. Thus, each such defendant shall, upon serving ten calendar years of the sentence, become subject to the jurisdiction of the parole board and eligible for parole consideration in accordance with

[25] When pressed at reargument to specify which feature of the penalty was constitutionally most offensive, counsel for Hasson specified the parole aspect. Indeed, counsel for Hasson suggested that he did not think a life sentence *with* the possibility of parole would be unconstitutional.

MCL 791.234(4)(a)-(d), (5); MSA 28.2304(4)(a)-(d), (5).[26]

LEVIN, BRICKLEY, and GRIFFIN, JJ., concurred with CAVANAGH, C.J.

MALLETT, J. (*concurring in part and dissenting in part*). I concur with the majority regarding the search and seizure issues presented by defendant-appellee, and agree that Const 1963, art 1, § 16 does contain a proportionality component. See *People v Lorentzen,* 387 Mich 167; 194 NW2d 827 (1972). I disagree with the majority's conclusion that the "most appropriate remedy" is "to ameliorate the no-parole feature of the penalty." See *ante,* p 42.

I am in agreement with the Louisiana Supreme Court that "the constitutional proscription against cruel and unusual punishment will override a legislatively imposed mandatory minimum sentence if, as applied to a given defendant for [this]

[26] Any persons currently incarcerated under the same penalty and for the same offense as the defendants at bar, who have already served ten calendar years of their sentences, shall become immediately subject to the jurisdiction of the parole board and eligible for parole consideration according to law.

We acknowledge that our decision today may have the effect of creating an arguable incongruity in the statutory scheme governing cocaine possession. The penalty for possessing 225 to 650 grams of cocaine is arguably more severe than the penalty for possessing 650 grams or more as modified by our decision today, in that the penalty for the former offense is a mandatory minimum sentence of twenty years in prison with no possibility of parole. MCL 333.7403(2)(a)(ii), 791.234(4); MSA 14.15(7403)(2)(a)(ii), 28.2304(4). On the other hand, the penalty for possessing 225 to 650 grams, unlike that for possessing 650 grams or more, permits a downward departure from the minimum sentence "if the court finds on the record that there are substantial and compelling reasons to do so." MCL 333.7403(3); MSA 14.15(7403)(3). In any event, the validity of the penalty for possession of 225 to 650 grams is not before us in this case. Furthermore, the Legislature remains free to modify the statutory scheme in response to our decision today, either prospectively or, in the case of any ameliorative modifications, both prospectively and retrospectively. See *People v Schultz,* 435 Mich 517; 460 NW2d 505 (1990).

crime the punishment is constitutionally exces-
sive." *State v Barberousse,* 480 So 2d 273, 280 (La,
1985). While I agree with Justice RILEY that in
most cases, "the Legislature has the constitutional
power to enact mandatory sentences requiring
uniform application to all defendants convicted of
certain crimes," *post,* p 65, it is my belief that in
each case where a defendant is convicted of posses-
sion of 650 grams of a controlled substance, poten-
tially contained therein is a constitutional claim of
cruel or unusual punishment for the imposition of
life imprisonment without the possibility of parole.
It is therefore my position that the constitutional
infirmity of the statute[1] rests not with the no-
parole feature, but with the statute's mandatory
uniform and blanket application to all defendants.

A trial court's inquiry into the constitutional
imposition of this penalty should recognize the
Legislature's judgment that persons who are con-
victed for violating this statute have engaged in
reprehensible activity that has ravaged communi-
ties across this state. With that in mind, a trial
court should then afford defendants an opportu-
nity to present substantial, compelling, objective
and verifiable reasons that the penalty of non-

---

[1] MCL 333.7403; MSA 14.15(7403) provides in pertinent part:

(1) A person shall not knowingly or intentionally possess a
controlled substance or an official prescription form or a pre-
scription form unless the controlled substance, official prescrip-
tion form, or prescription form was obtained directly from, or
pursuant to, a valid prescription or order of a practitioner
while acting in the course of the practitioner's professional
practice, or except as otherwise authorized by this article.

(2) A person who violates this section as to:

(a) A controlled substance classified in schedule 1 or 2 which
is either a narcotic drug or described in section 7214(a)(iv), and:

(i) Which is in an amount of 650 grams or more of any
mixture containing that controlled substance is guilty of a
felony and shall be imprisoned for life.

parolable mandatory life, *as it is applied to them,* is unconstitutionally disproportionate. I would not foreclose the possibility that such substantial, compelling, objective and verifiable reasons might convince a trial court to deviate from nonparolable mandatory life and impose a substantial term of years.[2]

The imposition by the Legislature of a mandatory life sentence without parole for this crime strips the judiciary of necessary discretion. The Legislature cannot foreclose the judiciary from exercising its responsibility to examine any and all constitutional claims, particularly those offered by defendants claiming cruel and/or unusual punishment violations.

Nevertheless, on the basis of the precise circumstances and facts of the cases currently before this Court, I am not convinced that the imposition of the mandatory life sentences without possibility of parole is in fact violative of Const 1963, art 1, § 16. Because neither I nor my colleagues are prepared to act as sentencing judges, these cases should be remanded to the trial court for sentencing hearings. This would afford both the prosecution and the defendants the opportunity to create a record that would establish the foundation or lack thereof for individual challenges to the imposition of the mandatory minimum sentence of life without possibility of parole.

---

[2] By striking down MCL 791.234(4); MSA 28.2304(4) in so far as it denies prisoners parole if they have been sentenced for life or for a minimum term of years for a major controlled substance offense, the majority will create some confusion in that the mandatory minimum sentence for possession of 225 to 650 grams of a controlled substance is twenty years without the possibility of parole, unless "the court finds on the record that there are substantial and compelling reasons" to depart from the minimum. MCL 333.7403(3); MSA 14.15(7403)(3). A departure from the imposition of mandatory life without the possibility of parole to a term of years less than twenty diminishes the severity of the crime being punished.

Riley, J. (*concurring in part and dissenting in part*). On February 24, 1988, while on probation for possession with the intent to deliver heroin, Kenneth Hasson delivered 15,042.40 grams of cocaine—worth an estimated $11 million on the street—to Ruth Bullock[1] at Capital City Airport near Lansing, Michigan. Both Hasson and Bullock were convicted of possessing over 650 grams of cocaine[2] and sentenced to life imprisonment without the possibility of parole.[3]

While I agree with the majority that the Court of Appeals erred in reversing Hasson and Bullock's convictions on the basis of the search and seizure issue, I am compelled to dissent from the majority's conclusion that the mandatory penalty of life imprisonment without the possibility of parole is unconstitutional because it constitutes "cruel or unusual punishment" in violation of Const 1963, art 1, § 16. I do so for three reasons.

First, I believe that *People v Lorentzen,* 387 Mich 167; 194 NW2d 827 (1972), the principle case relied on by the majority to support its conclusion, was wrongly decided and that proportionality is not, and has never been, a component of the "cruel or unusual punishment" clause of this state's constitution. Const 1963, art 1, § 16. Second, I disagree with the majority that there is a "compelling reason" to interpret Const 1963, art 1, § 16 differently from the federal counterpart in the Eighth

---

[1] At the time of her arrest, Ruth Bullock had in her automobile one burnt marijuana cigarette remnant in the ashtray and another in the glove box, along with assorted cocaine paraphernalia and a bag of cocaine residue. On the front passenger seat, the arresting officer found and opened a large purse containing $1,200 in cash in a bank envelope and two banded $500 bundles of cash, along with several miscellaneous denominations totaling $3,000. A clutch purse, located inside the larger purse, contained Bullock's identification, an additional $55 in cash, and another bag of cocaine residue.

[2] Pursuant to MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i).

[3] As mandated by MCL 791.234(4); MSA 28.2304(4).

Amendment, analyzed by the United States Supreme Court in *Harmelin v Michigan*, 501 US —; 111 S Ct 2680; 115 L Ed 2d 836 (1991). And finally, I believe that the majority's resolution of these cases violates the separation of powers doctrine mandated by our constitution.

Thus, I write separately to express my concern that, from this day forward, the citizens of the State of Michigan may rightfully conclude that

> [w]hat the Court means is that a sentence is unconstitutional if it is more severe than five Justices [or in this case four] think appropriate. [*Solem v Helm*, 463 US 277, 305; 103 S Ct 3001; 77 L Ed 2d 637 (1983) (Burger, C.J., dissenting).]

## I

The majority, relying on *Lorentzen, supra,* concludes that Const 1963, art 1, § 16 requires the Legislature to enact penalties proportional to the criminal offense. However, a careful analysis of *Lorentzen* reveals that the conclusion reached by the majority is clearly wrong. The *Lorentzen* decision is founded on the following four premises.

> First, that this Court has construed the Michigan "cruel or unusual punishment" clause to mean that if a sentence is not in excess of a statute, then the Supreme Court has no control over the punishment imposed. *Lorentzen, supra* at 173.
>
> Second, that this Court has determined that the prohibition against "cruel or unusual punishment" was an attempt by our founders to prevent the government from inflicting inhumane or barbarous punishment. *Id.* at 174.
>
> Third, that the Legislature has the exclu-

sive power to determine the length of impris-
onment for a felony. *Id.*

Fourth, that this Court has directly, or by
inference, applied the test of proportionality
to the sentence imposed when challenged un-
der the "cruel or unusual punishment"
clause. *Id.* at 174-175.

The *Lorentzen* Court then reached the following
conclusion:

> It will be seen from the above discussion of the
> leading United States Supreme Court case[4] and
> cases decided by this Court that the dominant test
> of cruel and unusual punishment is that the pun-
> ishment is in excess of any that would be suitable
> to fit the crime. [*Id.* at 176.]

Because I am persuaded that the analysis in
*Lorentzen* does not adequately support its fourth
premise and ultimate conclusion, I dissent from
my colleagues' reliance on that case. I believe that
a proper analysis of the cases illustrates that the
"cruel or unusual punishment" clause was in-
tended to prohibit inhumane and barbarous treat-
ment of the criminally convicted, and does not
have a proportionality component.

## II. THE *LORENTZEN* CASES[5]

The first case in which this Court directly ad-

---

[4] *Weems v United States,* 217 US 349; 30 S Ct 544; 54 L Ed 793
(1910).

[5] I note here that the majority challenges my analysis of the
*Lorentzen* opinion. It appears clear, from the majority's response, that
we have an honest philosophical difference over the meaning of "cruel
or unusual punishment" and the correctness of *Lorentzen. Ante,* p 35,
n 18. The difference runs deep, even to the meaning of separation of
powers. *Ante,* p 41, n 24. The majority does concede, however, that
the *Lorentzen* Court allowed for differing interpretations of the case
law it relied on. *Ante,* p 35, n 18. Therefore, I invite readers to review
the cases referenced in *Lorentzen* to draw their own conclusions.

dressed the meaning of the "cruel or unusual punishment" clause was *People v Morris,* 80 Mich 634; 45 NW 591 (1890).[6] Morris, convicted of stealing a horse, was sentenced under the pertinent statute to a mandatory seven years' imprisonment.

---

[6] The *Lorentzen* Court refers to several other cases decided by this Court before *Morris* which do not support a finding of proportionality in the "cruel or unusual punishment" clause. In *Cummins v People,* 42 Mich 142; 3 NW 305 (1879), the first reported decision in which this Court considered the "cruel or unusual punishment" clause of Const 1850, art 6, § 31, we rejected the argument that a sentence was "cruel or unusual" when the punishment imposed was *within* the penalty prescribed by the Legislature. *Id.* at 144. Nine years later, the Court struck down a penalty, under the "excessive fines" clause of Const 1850, art 6, § 31, that required a druggist to forfeit his business for five years after twice being convicted of violating the state liquor law. *Robison v Miner,* 68 Mich 549; 37 NW 21 (1888). The *Robison* Court surveyed the common law and concluded that the law had never inflicted such a severe penalty for any type of similar criminal behavior. *Id.* at 563. Chief Justice SHERWOOD agreed with the majority that the forfeiture penalty was an "excessive fine," as prohibited by Const 1850, art 6, § 31, but admonished his colleagues to

> pause long and consider well the action by the Legislature in establishing [the penalties], before it will say those fixed by its enactments are so far in excess of what is necessary to furnish the protection desired as to be obnoxious to the Constitution . . . . [*Id.* at 574.]

It is important to note that the *Robison* Court did not refer to *Cummins* because the issue in *Robison* was whether a fine was "excessive" under the state liquor law, rather than whether the fine was "cruel or unusual punishment." A few months later, the Court was asked to clarify its position in *Robison* and determine if the penalty for violating the liquor law as a first offender was also constitutionally defective as an "excessive fine." *Luton v Newaygo Circuit Judge,* 69 Mich 610; 37 NW 701 (1888). Although uncomfortable with the penalty, the Court held that it was not an excessive fine.

> While we may think this penalty a very severe one for a first offense, yet it is one within the discretion of the Legislature, with which discretion the courts cannot interfere. . . . *Whether such distinction was made wisely or unwisely is no concern of the courts, provided the Legislature had the power to make it. The injustice of the statute, if it exists, must be remedied by the people through the Legislature.* [*Id.* at 613-614. Emphasis added.]

Next, in *People v Murray,* 72 Mich 10; 40 NW 29 (1888), the defendant challenged his conviction and sentence of fifty years for a

His argument (similar to the one made by the defendants in this case) was that the penalty prescribed in the statute was "cruel or unusual punishment" because it was greater than the penalties for similar criminal offenses. The Court rejected defendant's argument that Const 1850, art 6, § 31 commands the Legislature to prescribe a punishment that is proportional to the criminal offense.

> Counsel for defendants claims that, as properly understood, it means, when used in this connection, punishment out of proportion to the offense. If by this is meant the degree of punishment, we do not think the contention correct. [*Id.* at 638.]

In reaching this conclusion, the *Morris* Court relied on the original meaning of the clause and the reason for its inclusion in the Michigan Declaration of Rights.[7]

---

statutory rape as "cruel or unusual punishment" under Const 1850, art 6, § 31. The challenge to his punishment, however, was not aimed at the underlying statute (permitting indeterminate sentencing), but rather to the penalty imposed by the trial judge. The *Murray* Court found:

> Where the punishment for an offense is for a term of years, to be fixed by the judge, it should never be made to extend beyond the average period of persons in prison life, which seldom exceeds 25 years. [*Id.* at 17.]

Although cited in *Lorentzen,* the Court, in *People v Armstrong,* 73 Mich 288; 41 NW 275 (1889), never addressed the issue that the defendant's punishment was "cruel or unusual," because it found that the municipality did not have the authority to enact the ordinance in question. Therefore, the city could not enforce it against the defendant. See *id.* at 296.

[7] The *Morris* Court began its discussion by recognizing the principle enunciated in *Luton.*

> With the policy of the law it is not our province to deal. That belongs to the Legislature, which is composed of representatives direct from the people, and who alone have the right to voice the sentiments of the people in the public enactments.

The *Morris* Court also relied on Justice COOLEY's treatise on Constitutional Limitations and the conclusion reached therein that punishment was not "cruel or unusual" if inflicted in the same way, or in a similar mode, as permitted by the common law. Cooley, Constitutional Limitations (4th ed), p 408, as quoted in *Morris, supra* at 639. Under Justice COOLEY's analysis, punishments forbidden by the clause were

> "those degrading punishments, which in any state had become obsolete before its existing constitution was adopted, we think may well be held forbidden by it as cruel and unusual. We may well doubt the right to establish the whipping-post and the pillory in states where they were never recognized as instruments of punishment, or in states whose constitutions, revised since public opinion had banished them, have forbidden cruel and unusual punishments. In such states the public sentiment must be regarded as having condemned them as cruel, and any punishment which, if ever employed at all, has become altogether obsolete, must certainly be looked upon as unusual." [*Id.*]

Although the *Morris* Court discussed the proportionality argument in its opinion, it certainly did not rely on proportionality for its holding. Rather, in a separate portion of its analysis, the Court assumed arguendo that if proportionality were a component of the "cruel or unusual punishment" clause, the penalty prescribed by the Legislature in *Morris* would not violate Const 1850, art 6, § 31. *Morris, supra* at 639.

When those sentiments are enacted into law, the only province of the Court is to determine their validity under the Constitution. The rule by which courts must be governed in such cases is as follows:

"When a statute is challenged as in conflict with the fundamental law, a clear and substantial conflict must be found to exist to justify its condemnation." [*Id.* at 637.]

The *Morris* interpretation of the "cruel or un-usual punishment" clause was followed by this Court until *People v Mire,* 173 Mich 357; 138 NW 1066 (1912), wherein, departing from precedent (*Morris* and its progeny),[8] the *Mire* Court deter-mined that a challenge to a sentence as "cruel or unusual punishment" focused on the act commit-ted by the defendant, not the statute prescribing the penalty, thereby inferring that proportionality was to be considered in sentencing. However, the *Mire* interpretation was abandoned a decade later in *Smith v Wayne Probate Judge,* 231 Mich 409; 204 NW 140 (1925).[9]

In *Smith,* the law giving parents the right to sterilize their "feeble-minded children" was chal-lenged. The issue raised was whether the means provided by the statute to "carry out its object are so cruel, inhuman, unreasonable and oppressive, that the legislature has no constitutional right to enforce them." *Id.* at 416. However, before address-ing the issue, the Court stated:

---

[8] See also *People v Smith,* 94 Mich 644, 646; 54 NW 487 (1893) (a statute providing a greater penalty for receiving stolen property than for larceny is not cruel or unusual punishment); *People v Whitney,* 105 Mich 622, 626-627; 63 NW 765 (1895) (the Legislature has the power to impose strict penalties for violating state liquor laws); *People v Huntley,* 112 Mich 569, 577; 71 NW 178 (1897) (a statute providing for prison inmates who commit crimes in prison to be held to the same punishment as free citizens who commit crimes outside of prison does not violate the cruel or unusual punishment clause); *People v Cook,* 147 Mich 127, 133; 110 NW 514 (1907) ("[i]t is laws providing for cruel and unusual punishments that the Constitution refers to and prohibits, and not sentences by courts under constitu-tional laws").

[9] The reference made by the *Lorentzen* Court to *People v Dumas,* 161 Mich 45; 125 NW 766 (1910), decided after *Mire* and before *Smith,* as "directly or by inference apply the test of proportionality to the sentence imposed" is equally misplaced. *Lorentzen, supra* at 176. One issue raised in *Dumas* was whether the trial court abused its discre-tion in imposing a life sentence, under the indeterminate sentencing statute, for second-degree murder. After reviewing the record, the Court found that it did not. The *Dumas* Court never considered, directly or indirectly, the defendant's sentence in light of the "cruel or unusual punishment" clause.

*The only purpose of this constitutional provision
is to place a limitation on the power of the legisla-
ture in fixing punishment for crimes.* There is no
element of punishment involved in the steriliza-
tion of feeble-minded persons. In this respect it is
analogous to compulsory vaccination. Both are
nonpunitive. It is therefore plainly apparent that
the constitutional inhibition against cruel or un-
usual punishment had no application to the surgi-
cal treatment of feeble-minded persons. *It has
reference only to punishments inflicted after con-
victions of crimes.* [*Id.* at 416. Emphasis added.]

For almost fifty years after the *Smith* decision
(and before *Lorentzen*), the law in Michigan re-
mained settled with regard to the meaning of the
"cruel or unusual punishment" clause.[10] When
reviewing challenges to punishment as "cruel or

---

[10] See *People v Jagosz,* 253 Mich 290; 235 NW 160 (1931) (a sentence
of twelve to thirty years for rape was not "cruel or unusual punish-
ment"); *People v Cramer,* 247 Mich 127, 136; 225 NW 595 (1929) (the
penalty for not reporting a live birth within five days was not "cruel
or unusual punishment"); *Steele v Sexton,* 253 Mich 32, 36; 234 NW
436 (1931) (the loss of a right to high school credits and a graduate
diploma, on the basis of a wilful violation of a statute, was not "cruel
or unusual punishment"); *People v Paton,* 284 Mich 427, 429; 279 NW
888 (1938) (the sentence for breaking and entering was within the
statute and was not "cruel or unusual punishment"); *People v Har-
wood,* 286 Mich 96, 98; 281 NW 551 (1938) (five to fifteen years
imprisonment for placing a foul substance in a taxicab was not "cruel
or unusual punishment" since it is within the statute provided by the
Legislature); *In re Ward,* 295 Mich 742, 746; 295 NW 483 (1940) (a
sixty-day imprisonment for twice failing to answer to a grand jury
was not "cruel or unusual punishment" within the meaning of the
clause); *In re Southard,* 298 Mich 75, 80-81; 298 NW 457 (1941) (the
length of a sentence for a felony conviction is a legislative task and
not subject to judicial supervision); *People v Sarnoff,* 302 Mich 266; 4
NW2d 544 (1942) (imprisonment for a continual violation of a munici-
pality's building code cannot be characterized as "cruel or unusual
punishment"; the phrase applies to something inhumane and barba-
rous, torture and the like); *People v Commack,* 317 Mich 410, 415; 26
NW2d 924 (1947) (the penalty for statutory rape was not "cruel or
unusual" since the sentence was within the statutory limits); *In re
Doelle,* 323 Mich 241, 245; 35 NW2d 251 (1948) (the length of impris-
onment for a specific felony is a matter of legislative determination
and is not subject to judicial supervision unless the sentence imposed
violates provisions of the statute).

unusual," this Court uniformly applied two princi-
ples: 1) that the drafters of the state constitution
were cognizant of the abuses imposed by the
Stuarts, during the reign of King James II, and
sought to prohibit the recurrence of the inhumane
and barbarous treatment of criminals by restrict-
ing the type of punishment the Legislature could
impose under the law; and 2) that the length of
incarceration, although subject to the constitu-
tional prohibition against cruel or unusual punish-
ment, is a legislative choice not subject to judicial
abrogation unless truly inhumane or barbarous. In
sum, the conclusion reached by the majority today,
relying on *Lorentzen* to justify a test of proportion-
ality with regard to punishments prescribed by the
Legislature, is simply untenable.

III

"That the legislative solution appears undesir-
able, unfair, unjust or inhumane does not of itself
empower a court to override the legislature and
substitute its own solution." [*Doe v Dep't of Social
Services,* 439 Mich 650, 681; 487 NW2d 166 (1992).]

In addition to my disagreement with the major-
ity over the correctness of *Lorentzen,* I also do not
agree with the reasons offered by my colleagues to
conclude that Const 1963, art 1, § 16 commands a
different meaning than that of the Eighth Amend-
ment. First, the majority finds that the state con-
stitution is an independent source of rights that
supersedes federal law, and second, it concludes
that there are "compelling reasons" to hold that
Const 1963, art 1, § 16 is broader in scope than the
Eighth Amendment, as currently construed by the
United States Supreme Court in *Harmelin, supra.*
I disagree with both arguments for the following
reasons.

A

> [T]he limits of legislative power are defined by
> our federal and state constitutions, not by the
> sentiment of the judiciary. [*Doe, supra* at 681.]

In its analysis of the role this Court plays in
state constitutional adjudication, the majority first
contends that the Michigan Constitution is an
independent source of rights, different in scope
from the federal counterpart, and that the federal
court decisions interpreting the parallel constitu-
tional provisions are not presumptively correct.[11] I
cannot subscribe to the majority's argument be-
cause it is evidence of its decision to eschew the
historical foundations which the Michigan consti-
tutional provision shares with its federal counter-
part.[12] Furthermore, I view it as nothing more
than an attempt to substitute a judicial policy
choice for the policy choice already made by our
Legislature.

Clearly evidencing its policy choice regarding
control over the increased drug use in Michigan
since 1978, the Michigan Legislature has twice
amended the penalty provisions of the Controlled
Substances Act, MCL 333.7401; MSA 14.15(7401),
MCL 333.7403; MSA ·14.15(7403). The first amend-
ment, which took effect on March 30, 1988, re-
duced the mandatory minimum sentence for the
possession of 225 grams, but less than 650 grams,
from twenty years to ten. The mandatory min-
imum for possessing 50 to less than 225 grams was
lowered from ten years to five at the same time.
The statute was also amended to allow the sen-
tencing court to depart from the minimum terms
specified for all the amounts, except 650 grams or

[11] CAVANAGH, C.J., *ante*, pp 27-29.
[12] See II.

more, "if the court finds on the record that there are substantial and compelling reasons to do so." MCL 333.7401(4); MSA 14.15(7401)(4), MCL 333.7403(3); MSA 14.15(7403)(3). However, the Legislature amended the act a second time in 1989, and reinstated the mandatory minimum prison terms to their original levels. The Legislature never amended the penalty for those convicted of possessing over 650 grams.

Admittedly, from time to time the legislative process may appear to be agonizingly slow and unresponsive. Frustrated in the quest for a legislated amendment, there may be those (including members of the Legislature) who would urge this Court to act, because the Legislature may not. However, while this Court may disagree with the legislative mandate of life imprisonment without parole for drug dealers, it is not within the power of this Court to correct the perceived injustice by judicially legislating a socially or politically desirable result. Yet in reaffirming the erroneous principle of *Lorentzen* that Const 1963, art 1, § 16 demands proportional sentences, the majority has assumed the power to do just that.

B

> We believe that [a] compelling reason for an independent state construction might be found if there were significant textual differences between parallel provisions of the state and federal constitutions, and, particularly, if history provided reason to believe that those who framed and adopted the state provision had a different purpose in mind. [*People v Collins,* 438 Mich 8, 32; 475 NW2d 684 (1991) (opinion of Griffin, J.).]

In addition to my disagreement with my colleagues' deviation from federal constitutional anal-

ysis, I believe that their opinion fails to advance a "compelling reason" for this Court to find the "no parole" statute unconstitutional under Const 1963, art 1, § 16 where the United States Supreme Court has found the statute to be valid under the Eighth Amendment in *Harmelin.*

In *Harmelin,* the United States Supreme Court reviewed the same statute that is currently before this Court and rejected the petitioner's argument that mandatory life imprisonment without the possibility of parole for possessing *672* grams of cocaine violates the prohibition against "cruel and unusual punishment" under the Eighth Amendment. *Id.,* 115 L Ed 2d 864-865. A majority of the Court, agreeing with part IV of Justice Scalia's opinion, concluded that the " 'individualized capital sentencing doctrine,' " which takes into account the particular circumstances of the crime and of the criminal, only applies to *capital cases* and life imprisonment without the possibility of parole does not violate the Eighth Amendment prohibition against cruel and unusual punishment. *Id.,* 115 L Ed 2d 865.

The majority, however, was divided over the correctness of *Solem v Helm, supra,* and the assumption that proportionality is a component of the cruel and unusual punishment clause. Justice Scalia, writing for himself and Chief Justice Rehnquist, reviewed the history of the clause and found that proportionality is not a component of the Eighth Amendment. Justice Kennedy, writing for himself and Justices O'Connor and Souter, felt constrained by stare decisis to hold that a narrow proportionality principle encompasses *noncapital* cases. However, these three justices were of the opinion that the dangers flowing from drug offenses and the circumstances of the crime demonstrate that the Michigan penalty scheme did not

exceed constitutional limits, and that under the facts of the *Harmelin* case the accused's sentence was not so disproportionate as to constitute cruel or unusual punishment. *Id.,* 115 L Ed 2d 873-874. Justices White, Marshall, Stevens, and Blackmun dissented.

While I agree with Justice Scalia's analysis and conclusion in *Harmelin, supra,* that "*Solem* was simply wrong; the Eighth Amendment contains no proportionality guarantee," 115 L Ed 2d 846, I recognize that *Harmelin* is a plurality opinion. I base my finding that MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i) is constitutional solely on the historical foundations of Const 1963, art 1, § 16. The majority submits three arguments for its deviation from Justice Scalia's analysis, and, for that matter, from Justice Kennedy's Eighth Amendment jurisprudence. In doing so, the majority advocates a broader right under Const 1963, art 1, § 16, with which I disagree for the following reasons.

1

To set aside petitioner's mandatory sentence would require rejection not of the judgment of a single jurist, as in *Solem,* but rather the collective wisdom of the Michigan Legislature and, as a consequence, the Michigan citizenry. [*Harmelin,* 115 L Ed 2d 872-873 (Kennedy, J., concurring).]

The majority first contends that there is a "significant" textual difference in the Eighth Amendment (cruel *and* unusual punishment), from that in Const 1963, art 1, § 16 (cruel *or* unusual punishment), which enables the Court to give a "broader" interpretation of our constitutional prohibition against "cruel or unusual punishment." *Ante,* p

31. History, and this Court's use of the text of the clause, does not support its conclusion.

It is true that the prohibition against cruel or unusual punishment has been part of this state's constitutional jurisprudence for nearly two hundred years. Along with the panoply of rights incorporated in the Northwest Ordinance, Congress provided that, "[a]ll fines shall be moderate; and no cruel or unusual punishments shall be inflicted." Northwest Ordinance 1787, art II.

The drafters of Michigan's first constitution in 1835 incorporated the clause, but phrased it as a prohibition against "cruel and unjust punishments." Const 1835, art 1, § 18. The phrase was changed to a prohibition against "cruel or unusual punishment" in 1850. Const 1850, art 6, § 31. The Reports of the Proceedings and Debates of the Constitutional Convention of 1850 (Debates), and the Journal of the Constitutional Convention of 1850 (Journal), do not suggest that the delegates replaced the phrase "and unjust" with "or unusual" to give our constitutional provision a greater source of rights than that of the parallel federal clause. As the majority concedes,[13] there is

---

[13] CAVANAGH, C.J., *ante,* p 30, n 11.

There is no authority in our constitutional history or in the common law to support the assumption made by the majority that the drafters debated this phrase and concluded that the conjunctive "and" be omitted and replaced with the disjunctive "or" to permit a broader interpretation of our constitutional phrase than the Eighth Amendment.

The Debates, p 896, reveal the pertinent portion of § 31 of art 6 as "and cruel and unusual punishment shall not be inflicted . . . ." The Journal, however, presents the same phrase, p 478, as "and cruel or unusual punishment shall not be inflicted . . . ." Both documents note the adoption of an amendment which directed that the word "and" before the word "cruel" was to be stricken. Debates, p 897; Journal, p 480. The deletion appears in the enrolled version of the constitution found at p 538 of the Journal and p xxx of the Debates, which version also contains the word "or."

The only reference to this clause in the Debates was made by Delegate Hanscom who predicted that including any "undefinable"

no material to supplement the contention that there is a *deliberate* difference between the Eighth Amendment and our analogous provision.

Moreover, the delegates to each of the State Constitutional Conventions had the option of specifically including a proportionality component in the "cruel or unusual punishment" clause.[14] Several jurisdictions had such a provision in their own bills of rights, even at the time the leaders of Michigan were first considering the clause in 1835. See also *Harmelin, supra,* 115 L Ed 2d 853-858 (opinion of Scalia, J.).

In 1963, when our most recent constitution was adopted by the people of the State of Michigan, there were five states that constitutionally mandated punishments proportional to the offense in the "cruel or unusual punishment" clauses.[15] Presuming that the delegates of the 1963 Constitutional Convention were aware of these states' provisions, they must have considered and rejected the idea of amending the existing clause to require sentences proportional to the offense.[16]

---

terms, such as " 'excessive bail,' " and " 'unusual punishments,' " which "seemed to him to involve absurdity on its face," had little "beneficial effect on the action of courts." Debates, p 45.

[14] It is noteworthy to mention that the convention debates of 1908 and 1963 reveal that the same phrase, "cruel or unusual punishment," was preserved without any floor debate by the delegates. Const 1908, art 2, § 15, and Const 1963, art 1, § 16.

[15] Ind Const, art 1, § 16; Me Const, art 1, § 9; W Va Const, art 3, § 5; Vt Const, ch 2, § 39; RI Const, art 1, § 8.

[16] Additionally, it did not seem to matter to the *Lorentzen* Court that there is a·discernible difference between the conjunctive "and" and the disjunctive "or" when devising the proportionality component to the cruel or unusual punishment clause of Const 1963, art 1, § 16. In the cases relied upon by the *Lorentzen* Court to devise the proportionality component, the opinions use the words "and" and "or" synonymously. See also *Morris, supra.* Similarly, throughout the *Lorentzen* opinion itself, the Court uses the two words interchangeably when addressing claims arising under the Michigan constitutional prohibition against "cruel or unusual punishment." ("In this opinion, we consider only Lorentzen's claim that the statute

Therefore, contrary to the suggestion put forth by the majority,[17] I can find no tenable reason to believe that the replacement of the conjunctive "and" by the disjunctive "or" supports the argument that the drafters of the state constitution intended for this Court to interpret the phrase differently from the meaning that the United States Supreme Court has given the Eighth Amendment.

2

> "It is a fundamental principle of constitutional construction that we determine the intent of the framers of the Constitution and of the people adopting it." [*People v Collins, supra* at 32 (opinion of GRIFFIN, J.).]

The majority's second "compelling reason" is that " 'history provide[s] reason to believe that those who framed and adopted the state provision had a different purpose in mind,' 438 Mich 32— different, at any rate, from the historical understanding asserted by Justice Scalia." *Ante,* pp 32-33. Again, for the reasons stated in section II of my analysis, I must disagree with this conclusion.

. . . violates the United States and the Michigan constitutional prohibitions against cruel *and* unusual punishment." *Lorentzen, supra* at 171 [emphasis added]. "In *People v Morris,* . . . [we] rejected the proposition that cruel *and* unusual punishment constituted punishment out of proportion to the offense." *Lorentzen, supra* at 175 [emphasis added].)

In separate partial concurrences and partial dissents, Justices WILLIAMS and T. G. KAVANAGH also used the word "and" instead of "or" in concurring in result. ("I agree with his reasoning . . . that the mandatory 20-year minimum sentence is invalid as cruel *and* unusual punishment." *Id.* at 182 [T. G. KAVANAGH, J., concurring in part and dissenting in part, emphasis added]. "[T]he 20 year mandatory minimum sentence is invalid as cruel *and* unusual punishment." *Id.* at 182 [WILLIAMS, J., concurring in part and dissenting in part, emphasis added].)

[17] CAVANAGH, C.J., *ante,* p 30, n 11.

The Michigan constitutional prohibition against "cruel or unusual punishment" shares the same historical foundation as the Eighth Amendment. Proportionality is not, and has never been, part of that history. Thus, because the *Lorentzen* decision is not well founded in the history of this provision, the assertion of an opposite conclusion cannot be seriously maintained.

Moreover, the argument advanced by the majority, that history supports a finding that the drafters of the most recent state constitution had a purpose in mind different from that of the Eighth Amendment, fails to take into account the history and events surrounding the debates of the delegates at the 1961 Constitutional Convention. Before 1961, the United States Supreme Court rejected the argument that the rights of the criminally accused contained in the Bill of Rights apply to the states through the Fourteenth Amendment. The Warren Court, however, significantly altered state constitutional jurisprudence when it began to use the Fourteenth Amendment as a tool to selectively incorporate the Bill of Rights and make it applicable to the states. The total effect of the selective incorporation doctrine was not yet known by the delegates to the 1961 Michigan Constitutional Convention because *Mapp v Ohio,* 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961), the first case incorporating a rule of criminal procedure to the states, was decided while the convention was meeting. 1 Official Record, Constitutional Convention 1961, pp 488-533, 674-688.

The delegates could not predict from the *Mapp* opinion that in the following decade, all but four of the Bill of Rights guarantees relating to the criminal justice process would be made applicable to the states by the United States Supreme Court. I am persuaded that by extending the guarantees

of the federal constitution to the residents of our state, the delegates intended the interpretation of Const 1963, art 1, § 16 to parallel the corresponding federal provision.

Moreover, even assuming a compelling reason is required to deviate from federal jurisprudence, the majority fails to substantiate its assertion that history provides a "compelling reason" to find that those who framed and adopted the state provision had a different purpose in mind from those who framed the Eighth Amendment.

3

[T]he risk of assessing evolving standards [of decency] is that it is all too easy to believe that evolution has culminated in one's own views. [*Thompson v Oklahoma,* 487 US 815, 865; 108 S Ct 2687; 101 L Ed 2d 702 (1988) (Scalia, J., dissenting).]

The third "compelling reason" advanced by the majority is premised on its belief that "the penalty at issue . . . constitutes an unduly disproportionate response to the serious problems posed by drugs in our society." *Ante,* p 40. This observation parallels the one made in *Lorentzen* concerning the "evolving standards of decency."

In responding to this issue, I believe that the amicus curiae supplemental brief of the Prosecuting Attorneys Association correctly identifies the problems with an evolving standards test. As their brief posits at pp 15-16, "if 'evolving standards of decency' as to the appropriate (proportionate) sentence for a crime are to be the measure of the constitutionality of a legislatively set penalty, how is such an inquiry to be carried out? What is the measure? What informs the judgment? What tools

does a court have to make it? What enables a court to overrule society's expression of its 'standard of decency,' communicated through statute, imposing a different standard, which is also supposed to be *society's* standard and not the court's? Would not the court's role be to *discover* or *identify* society's 'standard of decency'—not what it should be, but what it *is,* and how better could society express [its] standard of decency than through its elected lawmakers? The alternative . . . for the judiciary is that

> "it is for *us* (the judiciary) to judge, not on the basis of what we perceive the Eighth Amendment originally prohibited, or on the basis of what we perceive the society through its democratic processes now overwhelmingly disapproves, but on the basis of what we think 'proportionate' and 'measurably contributory to acceptable goals of punishment'—to say and mean that, is to replace judges of the law with a committee of philosopher-kings. *Stanford v Kentucky* [492 US 361, 379; 109 S Ct 2969; 106 L Ed 2d 306, 324 (1989)]." [Opinion of Scalia, J., emphasis in original.]

Moreover, the same problem arises when a court relies on the "grossly disproportionate" theory. In tracking Justice Kennedy's analysis in *Harmelin,* my colleague, Justice BOYLE, suggests that "[t]o ensure appropriate deference to legislative judgments regarding the gravity of a particular crime, and the extent to which varying penological goals inform the scheme of punishment, a court's threshold inquiries should be only whether the sentence is grossly disproportionate." *Post,* p 72.

However, as I view it, the problem with a "grossly disproportionate" analysis is that, at best, it is a subjective standard to measure the constitutionality of a sentencing statute under Const 1963,

art 1, § 16. I am persuaded that our inquiry should not be whether a particular defendant's sentence conflicts with what a justice of this Court might think proper but rather, as Justice Holmes recognized in his dissent in *Lochner v New York,* 198 US 45, 75-76; 25 S Ct 539; 49 L Ed 937 (1905):

> Some . . . laws embody convictions or prejudices which judges are likely to share. Some may not. But a constitution is not intended to embody a particular [theory]. It is made for people of fundamentally differing views, and the accident of our finding certain opinions natural and familiar or novel and even shocking ought not to conclude our judgment upon the question whether statutes embodying them conflict with the Constitution of the United States.

Additionally, with all respect, I cannot agree with my colleague Justice MALLETT's conclusion that "the constitutional infirmity of the statute rests not with the no-parole feature, but with the statute's mandatory uniform and blanket application to all defendants." *Ante,* p 44. I believe that the Legislature has the constitutional power to enact mandatory sentences requiring uniform application to all defendants convicted of certain crimes. Indeed, the United States Supreme Court has opined that except with regard to capital sentences, mandatory sentences are constitutionally permissible. *Sumner v Shuman,* 483 US 66; 107 S Ct 2716; 97 L Ed 2d 56 (1987). However, more problematic, in my opinion, is the fact that Justice MALLETT does not provide guidance to trial courts regarding what "substantial, compelling, objective and verifiable reasons" might render the penalty at issue unconstitutional as applied to a particular defendant. *Ante,* p 45. Again, while we may disagree with the denial of discretion in

sentencing in light of individual factors in a particular case, I am persuaded that such determinations are solely within the province of the Legislature.

Not every state has a drug problem as severe as the State of Michigan, and the Legislature appears to have recognized this by penalizing drug dealers with nonparolable life imprisonment. Whether the legislation it enacted to address our drug problem is well conceived, or ill conceived, is not for this Court to decide. Our role is limited; we must make a principled neutral decision with regard to whether the legislative choice of punishment violates Const 1963, art 1, § 16 prescription against cruel or unusual punishment.[18] If the question is whether punishment meets the "evolving standards of decency," the answer must come from the democratically elected representatives of the people: the Legislature.

---

[18] The majority's contention that under my analysis "it would seem to follow . . . that this Court would be compelled to uphold such a penalty even if imposed on a child for stealing a loaf of bread, or on a forgetful taxpayer who fails to file a return on time," (*ante,* p 41, n 24) supposes that such an extreme example of legislative action will occur. Neither the present case nor any other relied on by the majority in its analysis presents such an extreme example of legislative action.

In his book, *Democracy and Distrust* (Harvard University Press, 1980), Professor John Hart Ely pondered the constitutionality of an extreme example of legislative action: specifically, a hypothetical statute passed by a crazed legislature prohibiting gall bladder operations except to save a person's life. His response was that the statute could not pass, and, if it did, it would be repealed and the representatives who passed it probably impeached. To the claim that perhaps that also would not happen, the representatives and the public all " 'just acting crazy,' " and there being no possibility of reasoning with them, Professor Hart responded, " '[y]ou know what you're telling me? That you don't believe in democracy.' " *Id.* at 182. He then concluded that "it can only deform our constitutional jurisprudence *to tailor it to laws that couldn't be enacted, since constitutional law appropriately exists for those situations where representative government cannot be trusted, not those where we know it can.*" *Id.* at 183 (emphasis added).

IV

In sum, I believe that *Lorentzen* was wrongly decided, and that the majority has failed to proffer independent grounds or compelling reasons to support its conclusion that Const 1963, art 1, § 16 has a different meaning from that of the Eighth Amendment. In essence, my colleagues conclude that a sentence will be considered "cruel or unusual punishment" if a majority of this Court is uncomfortable with the punishment prescribed by the Legislature. The majority today, even in the face of pending legislation that would amend the Controlled Substances Act and reduce the penalties prescribed, has chosen, with deliberation, to step into the breach. However, the fact that the Legislature has not as yet amended the "no parole" provision of the Controlled Substances Act, is not a sound reason for this Court to assume the legislative mantle.[19] Therefore, because I cannot persuade my colleagues to exercise restraint, I dissent.

BOYLE, J. (*concurring in part and dissenting in part*). I concur with the majority's resolution of the search and seizure issue. I also agree with Justice RILEY's conclusion that MCL 333.7403(2)(a)(i); MSA 14.15(7403)(2)(a)(i) is not unconstitutional and that Const 1963, art 1, § 16 should not be interpreted differently from the Eighth Amendment counter-

---

[19] Moreover, the inappropriateness of the majority's journey into the legislative arena is highlighted by its acknowledgment that its decision

> may have the effect of creating an arguable incongruity in the statutory scheme governing cocaine possession [*ante,* p 43, n 26],

thus underscoring the writer's point that this is quintessentially a legislative matter.

part. I would hold that the statute is not grossly disproportionate under either the Eighth Amendment or Const 1963, art 1, § 16, each of which contain a proportionality principle. For the reasons stated by Justice Kennedy in his concurrence in *Harmelin v Michigan,* 501 US —; 111 S Ct 2680; 115 L Ed 2d 836 (1991), I also believe that the mechanistic formula applied in *People v Lorentzen,* 387 Mich 167; 194 NW2d 827 (1972), fails to give sufficient deference to the judgment of the Legislature.

Nevertheless, although I am in agreement with Justices RILEY and MALLETT that Const 1963, art 1, § 16 does not require a different interpretation than the federal constitution, it is neither permissible to conclude that Michigan's cruel or unusual punishment provision provides less protection than the Eighth Amendment (Justice RILEY),[1] nor necessary to accept the suggestion that *Lorentzen* was rightly decided (Justice MALLETT). The Court's opinion in *Harmelin* recognizes a proportionality principle, and, under either constitution, the mandatory penalty is not facially disproportionate.[2]

I write separately to briefly state my reasons for

[1] Thus, while I can agree that the *Lorentzen* methodology is an incorrect approach to proportionality, it is simply incorrect to say that Michigan's cruel or unusual clause "does not have a proportionality component." (RILEY, J., *ante,* p 48.) Further, a grossly disproportionate analysis does indeed present a risk that the judiciary will improperly substitute its views for those of the Legislature, RILEY, J., *id.,* p 64, but that is a risk the United States Supreme Court is as yet not prepared to foreclose.

[2] The fact that Michigan did not adopt a specific proportionality principle, as did sister states of the Northwest Territory before adoption of the Michigan Constitution (Ohio Const 1802, art 8, § 14; Ind Const 1816, art 1, § 10), cuts against the claim that cruel "or" unusual should be interpreted differently than cruel *and* unusual. Further, a proposal to abolish the death penalty was rejected during the Constitutional Convention of 1835 and was only implemented by the Legislature eight years later, after several failed attempts. Abolition of this "cruel" or "unusual" penalty did not enter the constitution until 1963, art 4, § 46.

agreement with Justice MALLETT's conclusion that proportionality review is not precluded by either the state or federal constitution.

I

In *Harmelin v Michigan, supra,* the United States Supreme Court upheld Michigan's mandatory statutory penalty against an Eighth Amendment challenge. In so doing, a splintered Court offered differing approaches to the question whether a proportionality principle is embodied in the protections afforded by the Cruel and Unusual Punishment Clause of the United States Constitution. Justice Scalia announced that the understanding of the Eighth Amendment articulated in *Solem v Helm,* 463 US 277; 103 S Ct 3001; 77 L Ed 2d 637 (1983), "was simply wrong; the Eighth Amendment contains no proportionality guarantee." *Harmelin,* 111 S Ct 2686. Chief Justice Rehnquist was the only other justice to agree with this analysis. Justice Kennedy, emphasizing the principle of stare decisis, concluded that "the Cruel and Unusual Punishments Clause encompasses a narrow proportionality principle." *Id.,* 111 S Ct 2702. Justices O'Connor and Souter joined in this opinion.

Because the United States Supreme Court recognizes a proportionality principle limiting punishment in noncapital punishment cases, proportionality is part of this state's prohibition[3] against

---

[3] This is not the proportional exercise of discretion within statutory limits recognized in *People v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990), as a basis for challenging sentences. I am bound by the decision in that case, but adhere to my view that it was wrongly decided. The proportionality principle referenced is that encompassed by a claim that the statutory penalty is constitutionally disproportionate.

cruel or unusual punishment.[4] The scope of that
principle is hazy, and the proper test for consider-
ing its application in any particular case is subject
to dispute. *Harmelin* did not resolve that dispute.

Notwithstanding Justice Scalia's suggestion that
no proportionality principle survives outside the
death penalty context, it is apparent that seven
justices of the Court do not agree. Justice Kennedy
emphasized that several principles can be dis-
cerned regarding the proper scope and method of
proportionality review. First, Justice Kennedy
stressed the notion that decisions regarding the
length of prison terms constituted a "substantive
penological judgment" predicated upon "[d]etermi-
nations about the nature and purposes of punish-
ment for criminal acts implicat[ing] difficult and
enduring questions respecting the sanctity of the
individual, the nature of law, and the relation
between law and the social order." *Id.,* 111 S Ct
2703. Second, Justice Kennedy emphasized the
belief that the Eighth Amendment "does not man-
date adoption of any one penological theory." *Id.,*
111 S Ct 2704. Third, Justice Kennedy underscored
the importance of federalism and its recognition
that states adhering to different "penological as-
sumptions" might arrive at differing "sentencing
schemes." *Id.,* 111 S Ct 2704. Finally, Justice Ken-
nedy highlighted the principle that sentencing
review should be based on objective factors as
much as possible. *Id.* Summarizing, Justice Ken-
nedy observed:

All of these principles—the primacy of the legis-

---

[4] See *Weems v United States,* 217 US 349; 30 S Ct 544; 54 L Ed 793
(1910), *Rummel v Estelle,* 445 US 263; 100 S Ct 1133; 63 L Ed 2d 382
(1980), *Hutto v Davis,* 454 US 370; 102 S Ct 703; 70 L Ed 2d 556
(1982), and *Solem v Helm, supra.* For Michigan authority recognizing
a proportionality principle, see *People v Lorentzen, supra,* and *People
v Mire,* 173 Mich 357; 138 NW 1066 (1912).

lature, the variety of legitimate penological schemes, the nature of our federal system, and the requirement that proportionality review be guided by objective factors—inform the final one: the Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are "grossly disproportionate" to the crime. [*Harmelin,* 111 S Ct 2705, quoting *Solem.*]

The dissenters in *Harmelin* advocated a broader interpretation of the proportionality principle. Justice White, joined by Justices Blackmun and Stevens, urged continued use of the three-factor test employed in *Solem* emphasizing that punishment must be "tailored to a defendant's personal responsibility and moral guilt." *Harmelin,* 111 S Ct 2716. Justice Marshall dissented as did Justice Stevens, with whom Justice Blackmun concurred. The linchpin of analysis in each of the separate dissents was the notion that a proportionality principle is embodied in the Eighth Amendment and requires the Court to scrutinize legislative enactments to determine whether the punishment is disproportionate. *Harmelin,* 111 S Ct 2709-2720.

Like federal authority, our own precedents recognize a proportionality principle, but fail to provide a clear answer to the manner of review or the scope of protection afforded by the proportionality principle embodied in Michigan's Constitution. Chief Justice CAVANAGH traces his proportionality analysis to this Court's opinion in *Lorentzen. Ante,* pp 34-35. He apparently advocates a broad proportionality review, although he concludes that "even under Justice Kennedy's restrictive view of *Solem,* it is clear that an application of *Solem's* first prong 'leads to an inference of gross disproportionality.'" *Ante,* p 39, quoting *Harmelin.*

I disagree with the majority regarding both the

scope of the inquiry and the result. Since a majority of the United States Supreme Court has not agreed with Justice Scalia's view that "*Solem* was simply wrong," *Harmelin,* 111 S Ct 2686, we may not disregard the precedents of that Court, and must attempt to predict how a majority of the Supreme Court would describe its contours.

I would apply a narrow proportionality principle to sentencing cases such as this one. To ensure appropriate deference to legislative judgments regarding the gravity of a particular crime, and the extent to which varying penological goals inform the scheme of punishment, a court's threshold inquiries should be only whether the sentence is grossly disproportionate. In this case, the sentence is mandatory life without parole for the crime of possession of more than 650 grams of cocaine. This penalty is not grossly disproportionate on its face.

II

The issue before us is defendant Hasson's challenge to the statute on its face.[5] Because the absolute magnitude of the crime is grave and the principle of proportionality does not permit the judiciary to impose on the Legislature its subjec-

---

[5] Defendant Bullock did not raise the issue below, and the Court denied her motion to add the issue. In his brief, Hasson argued that the statute was unconstitutional on its face and as applied. I understood the "as applied" challenge to have been waived from the colloquy at oral argument, a conclusion supported by recognition that the factual context presents none of the circumstances utilized in *Solem.* Hasson possessed over fifteen kilograms of cocaine alleged to be worth eleven million dollars, had three previous convictions for possession of narcotics, and was on probation for possession of heroin with intent to sell at the time he committed the instant offense. Assuming such a challenge were before this Court, I would find that Hasson's sentence was not one of the "rare cases" of unconstitutionally disproportionate application.

In my view, this case does not present an "as applied" challenge. Therefore, I do not agree with Justice MALLETT'S conclusion that remand is appropriate.

tive view of appropriate responses to perceived evils, the statutory scheme passes constitutional muster. Our Legislature has created a statutory scheme that gives clear notice that punishment is tied to quantity, rather than to the underlying act, thus actually reducing the likelihood that sentencing discretion will subject an unwary offender to the ranges of an indeterminate scheme. The majority's finding that the penalty is cruel or unusual because it is imposed for mere possession of cocaine without any proof of intent to sell or deliver, is simply a non sequitur. The clear purpose of the Legislature is to deter the possibility of dissemination of such an amount, whether it is possessed with intent to deliver, or is subsequently lost, stolen, or misplaced.[6] To suggest that the penalty is grossly excessive because that possibility is neither rational nor sufficiently grave, requires accepting the unacceptable. No sentient citizen of Michigan can ignore the barbarousness of the drug culture, the destructive effects on our children, and the threat to the very survival of our urban centers. To suggest that the crime is not grave because it is not violent, is, as Justice Kennedy observed, "false to the point of absurdity." *Harmelin,* 111 S Ct 2706.

Unquestionably, the sentence is harsh. Nevertheless, where the social harm caused by the criminal conduct at issue is as devastating as that created by the drug epidemic in existence today, the penalty is not unconstitutional.

---

[6] Other courts have upheld sentences that harshly penalize the underlying act without regard to quantity. See *Terrebonne v Butler,* 848 F2d 500 (CA 5, 1988) (the court upheld a Louisiana statute imposing life in prison without parole for distribution of twenty-five packets of individual doses of heroin), and *Hutto v Davis,* n 4, *supra* at 375 (Powell, J., concurring) (the Court upheld a forty-year sentence for possession with intent to distribute applied to facts involving distribution of nine ounces of marijuana having "a street value of about $200").

III

It must be emphasized that the United States Supreme Court has forcefully observed that the proportionality principle will rarely result in a successful challenge because of the "substantial deference that must be accorded legislatures and sentencing courts . . . ." *Solem, supra* at 290, n 16. Indeed, the prosecution does not dispute that in some rare case on its particular facts the statute may be unconstitutionally applied. *People v Broadie,* 37 NY2d 100; 332 NE2d 338 (1975).[7]

Thus, the mere fact that a punishment falls within statutory limits of a constitutional statute does not end the inquiry.[8] Even where a statute is concededly valid, there may exist extraordinary circumstances that render it unconstitutional as applied under the facts of the case.[9]

Institutional concerns counsel a cautious approach to review of sentence length lest a court merely substitute its judgment of the most appropriate punishment in light of its judgment regard-

---

[7] The dissenters in *Harmelin* observed that since *Solem* the parties had cited only four cases reversed on the basis of proportionality. *Harmelin,* 111 S Ct 2713, n 2 (White, J., dissenting).

[8] Federal courts of appeal have held that an extended proportionality review is warranted on imposition of a life sentence without parole. *Young v Miller,* 883 F2d 1276 (CA 6, 1989). The contours of that analysis are unclear. Although Justice Kennedy's opinion in *Harmelin* narrows the proportionality review, it did not criticize the factors utilized in *Solem,* which included the harm caused or threatened to the victim or society "and the culpability of the offender," 463 US 292. See *State v Bartlett,* 171 Ariz 302; 830 P2d 823 (1992).

[9] Other courts have recognized the possibility of a constitutional challenge to a valid criminal statute. See, e.g., *People v Dillon,* 34 Cal 3d 441; 668 P2d 697 (1983); *People v Keogh,* 46 Cal App 3d 919; 120 Cal Rptr 817 (1975); *Faulkner v State,* 445 P2d 815 (Alas, 1968).

ing the gravity and social harm attached to the conduct. The United States Court of Appeals for the Fifth Circuit explained these concerns:

> It is one thing for a court such as we to contemplate an extreme case such as the felonizing of overtime parking, striking down such an action as outlandish, and quite another for us to interfere in the various gradations of punishment specified by the legislator for crimes which *no* one disputes are serious ones—and to do so on Constitutional grounds, at that. We may be competent to contemplate outrageous disproportion and declare that it cannot be; certainly, however, we are not equipped, nor do our procedures lend themselves to equipping us, with the factual knowledge and common sense of what *is* proportional, what punishments *should* be administered for particular offenses, and along what general lines the positive legislative attack on criminality should proceed. One who is to do this has need, like Antaeus, to touch the earth pretty frequently, an exercise to which our isolation does not conduce. [*Terrebonne v Butler,* 848 F2d 500, 506-507 (CA 5, 1988). Emphasis in the original.]

I would reverse the decision of the Court of Appeals and affirm the convictions of defendants Bullock and Hasson.[10]

---

[10] It is my personal belief that mandatory sentencing is unwise because it creates the kind of tension between the Legislature and the judiciary that classically leads to making bad law from hard cases. It is also true that "broad and unreviewed discretion exercised by sentencing judges leads to the perception that no clear standards are being applied, and that the rule of law is imperiled by sentences imposed for no discernible reason other than the subjective reactions

of the sentencing judge." *Harmelin,* 111 S Ct 2708. (Kennedy, J.,
concurring in part.) Michigan courts have addressed and attempted to
correct the subjective reactions of sentencing judges in applying the
test of substantial and compelling reasons for departure for amounts
except those exceeding 650 grams. *People v Hill,* 192 Mich App 102;
480 NW2d 913 (1991). That fact may suggest to the Legislature that
an escape hatch is also appropriate in the over 650-gram situation.
The question is, of course, for the Legislature to resolve. Indeed,
striking the mandatory aspects of the penalty may itself have the
effect of reducing to zero the universe of "rare" cases in which
discrete challenges to sentences imposed under this statute could be
successful.