*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JEFFREY RICARDO WIMBERLY,

Defendant-Appellant.

UNPUBLISHED
November 22, 2022

No. 356052
Calhoun Circuit Court
LC No. 2017-001453-FC

Before: M. J. KELLY, P.J., and CAMERON and HOOD, JJ.

PER CURIAM.

Defendant, Jeffrey Ricardo Wimberly, appeals by right the trial court's judgment of sentence, which the trial court entered after this Court remanded this case for resentencing.[1] On remand, the trial court sentenced Wimberly as a second-offense habitual offender, MCL 769.10, to serve consecutive sentences of 39 to 60 years in prison each for his two convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(d)(*ii*). Because Wimberly has not identified any errors involving his resentencing that warrant relief, we affirm.

## I. PHYSICAL PRESENCE DURING SENTENCING

## A. PRESERVATION AND STANDARD OF REVIEW

Wimberly first argues that the trial court erred when it had him appear by video at his resentencing hearing. To preserve a claim of error for appellate review, it must have been raised in the trial court. *People v Anderson*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 354860); slip op at 4. The purpose of the preservation requirement is to "induce litigants to do what they can in the trial court to prevent error and eliminate its prejudice, or to create a record of the error and its prejudice." *People v Mayfield*, 221 Mich App 656, 660; 562 NW2d 272 (1997). To be timely, the party asserting error must have asserted it at a time when the trial court could

---

[1] *People v Wimberly*, unpublished per curiam opinion of the Court of Appeals, issued November 24, 2020 (Docket No. 342751).

have corrected the error without the need for further legal proceedings. See *People v Carines*, 460 Mich 750, 764-765; 597 NW2d 130 (1999). A party generally does not make a timely assertion of error by raising it in a motion after the fact. See *People v Abraham*, 256 Mich App 265, 274-275; 662 NW2d 836 (2003).

In this case, Wimberly did not object to appearing at his resentencing by video. Instead, he participated in the hearing and the immediately preceding hearing on his lawyer's motion to withdraw. After the trial court decided that its original sentence was still appropriate, Wimberly asserted his right to appear in person. By waiting to file his objection until after the hearing, Wimberly deprived the trial court of the opportunity to correct the error at the time of the hearing. He also induced the trial court to waste judicial resources by holding a full sentencing hearing only to claim the right to a third sentencing hearing on the basis of an error that could easily have been rectified with a contemporaneous objection. See *Anderson*, ___ Mich App at ___; slip op at 4 ("Had defendant objected to his lack of physical presence during sentencing, the trial court could have immediately adjourned the proceedings, and this issue on appeal would likely have been avoided."). We conclude that a claim that the trial court violated a defendant's right to appear in person for sentencing is not timely when it is raised by filing a motion after the sentencing hearing. Instead, the defendant must object to appearing by video *at or before* the sentencing hearing in which he or she has been asked to appear by video. Because Wimberly did not timely assert his right to appear in person at or before the hearing, his claim of error is unpreserved.

This Court reviews de novo whether the trial court properly applied constitutional law. *People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019). However, this Court reviews an unpreserved claim of error for plain error. *Carines*, 460 Mich at 763. To establish his right to relief, Wimberly must show that the trial court committed a plain or obvious error and that the error affected the outcome of the lower court proceeding. *Id*. Reversal is only warranted if the plain forfeited error resulted in the conviction of an actually innocent person or the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id*.

## B. ANALYSIS

In *Anderson*, this Court addressed the propriety of holding a sentencing hearing by video under the authority of our Supreme Court's administrative order issued in response to the pandemic. This Court concluded that AO 2020-6 superseded MCR 6.6006 while it remained in effect. Accordingly, the trial court did not plainly err by failing to comply with MCR 6.006. See *Anderson*, ___ Mich App at ___; slip op at 5.

Nevertheless, the *Anderson* Court recognized that a defendant has a constitutional right to appear in person at a felony sentencing, and reiterated that a virtual appearance is no substitute for that right. *Id*. Accordingly, it was plain error for the trial court to sentence Wimberly while Wimberly appeared by video. *Id*. at ___; slip op at 6. This Court in *Anderson*, however, also held that having a defendant appear by video in violation of his or her constitutional right to appear in person was not a structural error. Rather, it was an error capable of being evaluated for harmlessness. *Id*. at ___; slip op at 6. As a result, in order to prevail on this claim of error, Wimberly must demonstrate that, but for the plain error, there was a reasonable probability that the outcome of his sentencing would have been different. *Id*. at ___; slip op at 6.

The *Anderson* Court identified the important considerations that support in-person sentencing:

> That this error was not a structural one does not detract from the importance of this constitutional right, and the impact of defendant appearing remotely must be separately analyzed. As our Court recognized, and numerous other courts have held, in-person, face-to-face hearings can be critical to sentencing decisions. Not only do in-person proceedings allow the court to gauge the veracity of a defendant during the hearing (including, perhaps most importantly, while listening to and watching defendant's allocution), but the formality of the courtroom, the presence of the attorneys, judge and staff, provide a solemn stage for such important decisions. Remote proceedings, despite the greatly improved and available technologies, simply do not compare to face-to-face interaction. [*Id*. at ___; slip op at 8 (citations omitted).]

Wimberly appeared by video, but the record showed that he had every opportunity to raise his sentencing issues to the trial court. The prosecutor submitted a sentencing memorandum to the court that outlined all of her positions, and Wimberly's lawyer submitted her own memorandum in opposition. Moreover, the transcripts of the sentencing hearing showed that Wimberly's lawyer was fully prepared for the hearing. She addressed corrections that needed to be made to the presentence investigation report (PSIR) and the proper scoring of the OVs, and she argued at length against the prosecution's suggested scores. She also consulted with Wimberly off the record and argued against ordering consecutive sentences. The trial court further gave Wimberly an opportunity to allocute and—similar to his first sentencing hearing—he asserted his innocence and implied that he was the real victim.

On this record, we conclude that there was not "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Anderson*, ___ Mich App at ___; slip op at 8 (quotation marks and citation omitted). Accordingly, reversal is not warranted on this basis.

## II. HABITUAL-OFFENDER ENHANCEMENT

### A. STANDARD OF REVIEW

Wimberly next argues that the trial court lacked the authority to sentence him as a habitual offender because the prosecutor never filed a proof of service that he had been given notice of the intent to seek a sentencing enhancement. This Court reviews de novo the proper interpretation and application of the law applicable to habitual-offender notice. *People v Head*, 323 Mich App 526, 542; 917 NW2d 752 (2018).

### B. ANALYSIS

The notice provisions stated under MCL 769.13 were intended to provide a defendant with notice at a sufficiently early stage of the proceedings to apprise him or her about the potential consequences should he or she be convicted of the underlying offense. *Head*, 323 Mich App at 543. The notice also serves to give the defendant an opportunity to respond. *Id*. at 544. In order

to seek an enhanced sentence under MCL 769.10, MCL 769.11, or MCL 769.12, the prosecution must file a written notice of his or her intent to do so within 21 days of certain events. MCL 769.13(1). The prosecutor must also file a written proof of service with the trial court. MCL 769.13(2).

The prosecution did not file a written proof of service with the trial court. However, Wimberly has not contested the accuracy of his criminal record or otherwise demonstrated that he would have been better able to respond had the prosecutor given him a more formal notice or filed the written proof of service. Indeed, he does not assert prejudice of any kind on appeal. Instead, he asks this Court to construe the requirements of MCL 769.13 as a bar to the application of sentencing enhancements whenever the prosecutor fails to strictly comply with the statute's requirements. That request, however, contradicts this Court's holding in *Head*. In that case, this Court held that "[t]he failure to file a proof of service of the notice of intent to enhance the defendant's sentence may be harmless if the defendant received the notice of the prosecutor's intent to seek an enhanced sentence and the defendant was not prejudiced in his ability to respond to the habitual-offender notification." *Head*, 323 Mich App at 543-544. See also *Burkett*, 337 Mich App 631, 646; 976 NW2d 864 (2021) (applying *Head*). Accordingly, when a defendant has actual notice of the intent to seek a sentencing enhancement, and the defendant has not shown prejudice as a result of the prosecutor's failure to file the proof of service, this Court must conclude that the error was harmless. *Burkett*, 337 Mich App at 646-647.

The register of actions shows that Wimberly was arraigned—or waived arraignment—on March 2, 2017, and that the prosecutor had by that time already submitted a complaint and felony warrant with notice of the intent to seek a sentencing enhancement under the habitual-offender statute. Consequently, Wimberly had actual notice of the prosecutor's intent to seek a sentencing enhancement under MCL 769.10 before the expiration of the 21-day time limit stated under MCL 769.13(1). Because he has not identified any prejudice occasioned by the prosecutor's failure to file the proof of service, Wimberly has not demonstrated that he is entitled to any relief. See *Burkett*, 337 Mich App at 646-647.

III. OFFENSE VARIABLES

A. STANDARD OF REVIEW

Wimberly also argues that the trial court erred when scoring his offense variables (OVs). Although the sentencing guidelines are now advisory, trial courts must still properly score the guidelines and must consider them when sentencing a defendant. *People v Lockridge*, 498 Mich 358, 392 n 28; 870 NW2d 502 (2015). "When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR, plea admissions, and testimony presented at a preliminary examination." *People v McChester*, 310 Mich App 354, 358; 873 NW2d 646 (2015). Further, the trial court may properly rely on inferences that arise from the record evidence when making the findings underlying its scoring of OVs. See *People v Haacke*, 217 Mich App 434, 436; 553 NW2d 15 (1996). "This Court reviews for clear error a trial court's findings in support of a particular score under the sentencing guidelines but reviews de novo whether the trial court properly interpreted and applied the sentencing guidelines to the findings." *People v McFarlane*, 325 Mich App 507, 531-532; 926 NW2d 339 (2018).

## B. OV 8

OV 8 must be scored at 15 points if a "victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." MCL 777.38(1). Any movement to a place or situation of greater danger is sufficient to establish asportation. *People v Barrera*, 500 Mich 14, 21; 892 NW2d 789 (2017).

In this case, AP testified at trial that she had obtained a gun and arranged to sell it to Wimberly. Wimberly came to her home with his cousin, Larry Martin, and she showed the gun to them. Wimberly told her that he wanted the gun but did not have the money with him. She agreed to accompany Wimberly to get the money. AP testified that she got into the backseat of an old, beat-up, sedan. Martin drove and Wimberly got into the front passenger seat. Martin drove a short distance, pulled over, and stopped the car. AP did not know why he stopped. However, when the car stopped, Wimberly immediately jumped over the seat, got on top of her, pushed her up against the door, and raped her. During the rape, Martin held her arms and Wimberly choked her and told her that he was going to kill her.

Inducing a person to get into a car invariably increases that person's vulnerability. The passenger is unable to control the car's movement and cannot safely exit the car unless the driver stops and pulls over to a place of safe exit. Furthermore, the enclosed space makes the passenger vulnerable to sudden attack and makes it less likely that he or she will be able to fend off the attacker. Indeed, that is precisely what happened in this case. Because AP was trapped in an enclosed space, Wimberly was able to pin her against the door and restrain her while he sexually assaulted her. As a result, under the facts of this case, Wimblery asported AP to a place of greater danger or to a situation of greater danger. MCL 777.38(1)(a). The fact that AP voluntarily accompanied Wimberly and Martin on the basis of her desire to obtain money does not preclude a finding of asportation because the statute does not require the use of force. *People v Dillard*, 303 Mich App 372, 379; 845 NW2d 518 (2013), overruled not in relevant part, *Barrera*, 500 Mich at 17.

Wimberly maintains that AP was not asported to a more dangerous place because he and Martin were more likely to be detected parked in the open on the street. He even cites the fact that a police substation was purportedly nearby the location where Martin stopped. However, his argument rests on the assumption that a place of greater danger can only be one in which the crime is less likely to be detected. It is true that moving a victim to a place where it is less likely that the crime will be detected satisfies the requirement that the victim be moved to a place of greater danger. *People v Chelmicki*, 305 Mich App 58, 70-71; 850 NW2d 612 (2014). But the statute does not limit the class of places to those where detection is less likely. Rather, it applies to any place or situation that is in any way more dangerous for the victim. MCL 777.38(1). Because the confined space of a car limits one's ability to maneuver and protect oneself if attacked, it constitutes a place or situation of greater danger.

The trial court did not clearly err by scoring OV 8 at 15 points.

## C. OV 10

The trial court assessed 15 points under OV 10. A trial court properly assigns 15 points under OV 10 when the offender engaged in predatory conduct. MCL 777.40(1)(a). The preoffense conduct must be directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation, and must be done with the primary purpose of victimization. *People v Cannon*, 481 Mich 152, 162; 749 NW2d 257 (2008).

Wimberly contends that—in the context of a sexual assault—preoffense conduct must involve planning the assault or grooming the victim in order to constitute predatory conduct. The Legislature, however, made no such distinction for sexual assaults. Instead, it defined predatory conduct to mean any "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). The evidence discussed under the analysis for OV 8 supported a finding that Wimberly engaged in preoffense conducted directed at AP for the purpose of victimizing her. Indeed, the events preceding the sexual assault permitted an inference that Wimberly had no intention to purchase the gun and that he used the need to get money as a ruse to induce AP to get into the car with him. The fact that Martin drove just a short distance and that Wimberly immediately jumped over the seat and attacked AP strongly suggested that Martin and Wimberly had preplanned the stop to enable Wimberly to attack AP. Thus, by using AP's desire to sell a gun against her, they used the promise of financial gain to get her to voluntarily get into a car with them. They then transported her to a location where Wimberly could violently sexually assault her. These actions met the definition of predatory conduct.

The trial court did not clearly err when it found that Wimberly engaged in predatory conduct directed at AP, who was susceptible to persuasion or temptation, and that he did so to victimize her. The trial court did not clearly err by scoring OV 10 at 15 points.

## D. OV 14

The court assessed 10 points under OV 14 because it determined that Wimberly "was a leader in a multiple offender situation." See MCL 777.44(1)(a). When scoring OV 14, the trial court had to consider the entire criminal transaction. MCL 777.44(2)(a). Here, the evidence showed that Martin, who was Wimberly's cousin, was 15 years of age when Wimberly sexually assaulted AP. Wimberly was older than Martin and had already "caught a felony"—as he himself stated at trial—before the assault at issue. That evidence permitted an inference that Wimberly was the more experienced and influential partner in the enterprise. The facts of the assault also supported an inference that Wimberly was the leader. AP showed the gun to Wimberly and that Wimberly agreed to purchase it. He then induced AP to get into the car. Martin drove the car and parked it a short distance from AP's house. Wimberly jumped the seat and attacked AP. The fact that Martin drove and then stopped while Wimberly acted on his urge to gratify himself sexually permitted an inference that Martin was a mere accessory acting to further Wimberly's goals. Additionally, Martin held AP's arms during the assault, and, when AP made eye contact with Martin and pleaded for her life, Martin tried to persuade Wimberly to let AP go, but Wimberly kept telling AP that he was going to "kill you, bitch." Taken together, the evidence shows that Martin was not in control of the situation but instead was acting to help Wimberly with his plans and that Wimberly was the decision-maker. The court did not, therefore, err by scoring OV 14 at 10 points.

## IV. CONSECUTIVE SENTENCING

### A. STANDARD OF REVIEW

Wimberly next contends that the trial court abused its discretion when it sentenced him to serve one of his sentences consecutive to the other. This Court reviews de novo whether the trial court properly applied the law when determining whether it had the authority to order consecutive sentencing. *People v Lee*, 233 Mich App 403, 405; 592 NW2d 779 (1999). This Court reviews a trial court's exercise of its discretion to order consecutive sentencing for an abuse of discretion. *People v Norfleet*, 317 Mich App 649, 664; 897 NW2d 195 (2016). A trial court abuses its discretion when its decision falls outside the range of reasonable outcomes. *Id.*

### B. EXERCISE OF DISCRETION

A trial court must ordinarily order a defendant to serve his or her sentences concurrently unless the Legislature has specifically authorized consecutive sentencing. *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012). The Legislature provided that a trial court "may order a term of imprisonment" imposed for a conviction of CSC-I to be "served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction." MCL 750.520b(3). As a result, the trial court had the authority to order Wimberly to serve either of his sentences for CSC-I consecutive to the other sentence.

When electing to order a defendant to serve his or her sentences consecutively, the trial court must articulate its rationale sufficiently to permit appellate review. *Norfleet*, 317 Mich App at 664-665. One rationale for imposing consecutive sentencing for multiple sexual penetrations in a single attack is to remove the security of concurrent sentencing, which would otherwise result in a defendant going unpunished for heightening the level of egregiousness during an attack. *Ryan*, 295 Mich App at 408-409.

At the first sentencing hearing, the trial court determined that Wimberly's extensive criminal history warranted consideration when considering whether to impose a consecutive sentence. The court explained that it "can, should, and must take into consideration the entirety of the person who stands before [it]." The court stated that it had considered Wimberly as a habitual offender and the facts of the offenses he committed. It noted that he had a lengthy criminal history, which included violent offenses and offenses against women. The trial court also took note of the tremendous harm that Wimberly inflicted on AP. It noted that she was, to be blunt, a "mess." The court recounted that AP "was barely able to testify, although, she managed, and she deserves great credit for managing to do so." The court found that Wimberly's acts had affected AP's whole life and the life of her family, which was not to be taken "lightly." The trial court candidly admitted that it had struggled a bit with how to impose sentence, but that it nevertheless felt that, "given your criminal history and the facts of this offense, you deserve to be in prison for a very long time." The court was troubled by the fact that he blamed everyone else for his conviction and that he had said "vile things" and made "veiled threats" at sentencing. The court felt that those comments were indicative of his "personality."

Subsequently, at the resentencing hearing, the trial court reiterated many of the same considerations. Indeed, the trial court specifically incorporated its decision on the issue from the

first sentencing hearing. The court characterized Wimberly as a "career criminal" who had been involved with the criminal justice system since he was a juvenile. The court also noted that there was evidence that Wimberly had put the victim and her family through "hell" after the sexual assault. The court specifically stated that the harms that Wimberly inflicted were not taken into consideration under the guidelines. The court also noted Wimberly's inability to comply with the law even while on parole. Taking everything together, the court again concluded that it was appropriate to sentence Wimberly to serve consecutive sentences of 39 years to 60 years each for his convictions.

The trial court's rationale for consecutive sentencing was coherent, cogent, and met the relevant articulation requirement. *Norfleet*, 317 Mich App at 664-665. The court properly considered both Wimberly's history as a habitual offender and the seriousness of his offenses. Notably, the trial court considered Wimberly's rehabilitative potential as revealed by his own comments at the first sentencing. At that hearing, Wimberly proclaimed that he was the real victim. He related that he never had sex with AP in a car. He further asserted that AP was "never raped," and was not held down, harmed, or threatened. He told the court that AP was "heartless and evil, along with the prosecution for deceiving this Court into believing a tale" that never happened. In his view, AP "should be standing where I am today answering for what she's done." He believed that would be true "justice."

Wimberly's statement that the victim of his brutal sexual assault was the true criminal in this case was highly relevant to determining his rehabilitative potential. As the trial court aptly stated, Wimberly's comments were vile. Given his lengthy criminal record and the circumstances involved in the sentencing offenses, the trial court was justified in determining that Wimberly was a proper candidate for consecutive sentencing. The court considered a variety of relevant factors in imposing consecutive sentencing and articulated those reasons on the record. Moreover, because determining whether to order consecutive sentences has historically been committed to the discretion of trial courts, the court could independently make its own findings of fact when determining whether to impose a consecutive sentence. *People v DeLeon*, 317 Mich app 714, 724-726; 895 NW2d 577 (2016). Wimberly has not identified any law that prohibits a trial court from considering factors that were or could have been encompassed by a sentencing factor under the advisory guidelines when making its decision. Because the trial court's decision was within the range of reasonable outcomes under the facts of this case, it cannot be said that the trial court abused its discretion. See *Norfleet*, 317 Mich App at 664. As this Court has stated, a trial court properly resorts to the "strong medicine of a consecutive sentence" when the defendant has demonstrated through his or her extensive and violent criminal record that he or she is unlikely to reform. See *People v Norfleet*, 321 Mich App 68, 73; 908 NW2d 316 (2017). The evidence supported the trial court's finding that Wimberly would likely not reform and sentenced him to serve his sentences consecutively, as authorized by the Legislature.

## V. CRUEL AND UNUSUAL PUNISHMENT

Wimberly also asserts that his sentence was not proportionate and amounted to cruel or unusual punishment. The Michigan Constitution prohibits cruel or unusual punishment. Const 1963, art 1, § 16. The Constitution of the United States prohibits punishments that are "cruel and unusual." US Const, Am VIII. If a punishment meets the requirements of the Michigan

Constitution, it necessarily meets the requirements of the federal constitution. *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011).

Michigan courts examine a variety of factors when determining whether a legislatively mandated sentence amounts to cruel or unusual punishment: the severity of the sentence that would be imposed on a first-time offender, comparison of the penalty imposed to other offenses under Michigan law, and comparison of the penalty in Michigan with the penalty imposed by other states for the same crime. *People v Bullock*, 440 Mich 15, 33-36; 485 NW2d 866 (1992). Michigan's Constitution also protects defendants from sentences that are grossly disproportionate to the offense. *Id*. at 32. Because Wimberly's sentences were each within the range provided under the advisory sentencing guidelines, his sentences were presumptively proportionate, and, a proportionate sentence is not cruel or unusual. See *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013); see also *People v Broden*, 428 Mich 343, 354-355; 408 NW2d 789 (1987) (stating that a sentence that falls within the sentencing guidelines is presumptively not excessively severe or unfairly disparate).

To overcome the presumption, Wimberly had to show that there was something unusual about the circumstances of his case that made the sentence disproportionate as applied to him. See *Bowling*, 299 Mich App at 558. Wimberly only asserts that his sentence amounted to cruel and unusual punishment because the facts of the rape that he committed were not particularly egregious, and yet the trial court sentenced him to serve a minimum prison term that virtually guaranteed that he would die in prison. Generally, when individual sentences fall within the guidelines range, aggregating the minimum sentences to be served consecutively does not render them disproportionate to the offender—even if the sentences ensure that the defendant will die in prison. See *People v Baskerville*, 333 Mich App 276, 291; 963 NW2d 620 (2020). A proportionate sentence is not cruel or unusual, and a defendant's age at the time of sentencing does not render it otherwise. See *Bowling*, 299 Mich App at 558-559.

The trial court did not violate the prohibition against cruel or unusual punishments by ordering Wimberly to serve his sentences consecutively.

## VI. REMAND TO A DIFFERENT JUDGE

Wimberly finally argues that this Court should remand this case to a different judge for resentencing because the trial court's erroneous decisions demonstrated that the court was biased against him. We need not consider that claim because Wimberly has not identified any errors that warrant resentencing.

Affirmed.

/s/ Michael J. Kelly
/s/ Thomas C. Cameron